In the Interest of M___ R___ F___, C___ S___ F___ and A___ S___ H___, children under seventeen years of age.

Tammy L. WALDEN, Juvenile Officer of Camden County, Respondent,

v.

M___ H___, Appellant.

No. 19970.

Missouri Court of Appeals, Southern District, Division Two.

Sept. 19, 1995.

Gene A. Hilton, Camdenton, for appellant.

David T. Welch, Phillips, McElyea, Walker & Carpenter, P.C., for respondent.

CROW, Judge.

The Juvenile Division of the Circuit Court of Camden County ("the juvenile court," § 211.021(3), RSMo 1986) decreed it had jurisdiction over three children under § 211.031.1(1), RSMo Cum.Supp.1993,[1] and entered orders of disposition as to each child.

M___ H___ ("Appellant"), mother of the children, brings this appeal. Her four points relied on are based on three contentions: (1) the juvenile officer's petitions were insufficient as a matter of law to vest the juvenile court with jurisdiction, (2) neither the petitions nor any summonses were ever served on her, and (3) there was no substantial evidence to support the juvenile court's jurisdictional findings.

■ Where a petition prays that a juvenile court take jurisdiction over a child because the child is in need of care and treatment, the standard of proof is clear and convincing evidence. *In Interest of D.D.H.,* 875 S.W.2d 184, 186[1] (Mo.App.S.D.1994).

The finding of jurisdiction need not be based on direct evidence. *Id.* at 186. The juvenile court, as a fact finder, may draw all reasonable inferences from the evidence and may base its findings upon such inferences. *Id.* at 186[2]. The paramount consideration is the welfare of the child. *Id.* at 186[3].

■ Appellate review is the same as in court-tried civil cases. *In Interest of L.W.,* 830 S.W.2d 885, 886[1] (Mo.App.S.D.1992). The judgment will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. *Id.* at 886. The appellate court views the facts and reasonable inferences therefrom in the light most favorable to the juvenile court's judgment. *Id.*

Two of the three children involved in this case are twin girls born March 9, 1994. They are M___ R___ F___ and C___ S___ F___, to whom we henceforth refer as "M___" and "C___," respectively. Their father is Jason F___ ("Jason").

The third child, A___ S___ H___, is a boy born November 29, 1989. We henceforth refer to him as "the male child." His father, unnamed in the record, is not Jason.

On March 31, 1994, Appellant, Jason and the three children were residing in a Camdenton apartment. That afternoon, Appellant and Jason took M___ to a clinic in Richland because, according to Appellant, M___ was "twitching" and not eating. A physician examined M___ about 3:45 p.m., and determined she was having seizures. The physician contacted the Division of Family Services ("DFS") about transporting M___ to the University of Missouri hospital in Columbia by helicopter.

M___ arrived at the University hospital later that date (March 31). Sara Sotiropou-

---

1. Section 211.031.1, RSMo Cum.Supp.1993, reads, in pertinent part:

   "... the juvenile court ... shall have exclusive original jurisdiction in proceedings:

   (1) Involving any child ... who may be a resident of or found within the county and who is alleged to be in need of care and treatment because:

   (a) The parents, or other persons legally responsible for the care and support of the child ... neglect or refuse to provide proper support, ... medical, surgical or other care necessary for his well-being...."

In this opinion, references to statutes are to RSMo Cum.Supp.1993 unless otherwise indicated.

los, a pediatrician and director of the pediatric residency program, was M____'s primary physician. Dr. Sotiropoulos testified that upon arrival, M____ was having continuous seizures; consequently, she was placed in the pediatric intensive care unit. Over the next six hours, M____, who weighed 3.3 kilograms,[2] lost all normal baby reflexes and went into a deep coma.

There were abrasions on M____'s nose and bruises on an arm and leg. Medical procedures during ensuing days revealed brain damage and blood in the subarachnoid space, characteristic of the "shaken baby syndrome." M____ remained in a coma four to five days.

Dr. Sotiropoulos concluded with reasonable medical certainty that the brain damage occurred within 24 hours before M____ was hospitalized. The damage rendered M____ cortically blind. According to Dr. Sotiropoulos, it is unlikely M____ will ever walk normally, and it is likely she will continue to have a seizure disorder. Dr. Sotiropoulos was unable to predict the extent of M____'s motor impairment.

On the morning of April 1, 1994, the day after M____ was hospitalized, Gaylene K. Dryer, a DFS children's service worker in Camden County, learned that doctors had ruled M____ had a "nonaccidental" head injury. Dryer was assigned to investigate. Her first duty was to contact the other children in the household to check their safety.

Dryer found the male child with Appellant's mother ("Lilly") on the afternoon of April 1. Lilly resided in an apartment in the same complex as Appellant, Jason and the children. Because the male child was sick, on medication, and asleep, Dryer obtained no information from him.

Lilly testified that earlier that day (April 1), the male child told her: "Jason sucked my wiener." Lilly revealed that disclosure to Dryer.

On April 4, 1994, Dryer interviewed the male child at Lilly's apartment. A police officer was present. Later that day, the officer interviewed the male child on videotape at the DFS office.

On April 6, 1994, the Juvenile Officer of Camden County ("Respondent") filed a petition alleging M____ was in need of the care and treatment of the juvenile court in that the parents or other persons legally responsible for her care, custody and support neglect or refuse to provide proper care and support. The petition continued:

"On or about the 31st day of March, 1994, [M____], a child three weeks of age who resides with her natural parents, [M____ H____] and Jason ... in Camden County, Missouri, was admitted to the University of Missouri–Columbia Hospital, where it was determined that said child was suffering from subdural hemorrhaging. Further, it was the opinion of the admitting physician ... that the hemorrhaging was a result of trauma suffered from an act of abuse."

The petition then listed the address of Appellant and Jason, and stated M____ was in the custody of DFS.

Respondent filed two other petitions April 6, 1994. One pertained to C____; the other pertained to the male child. Each petition alleged the subject child was in need of the care and treatment of the juvenile court in that the parents or other persons legally responsible for the care, custody and support of such child neglect or refuse to provide proper care and support. The petition regarding C____ further alleged:

"On or about the 31st day of March, 1994, [M____], a child three weeks of age and the twin sister of [C____], both of whom reside with their natural parents, [M____ H____] and Jason ... in Camden County, Missouri, was admitted to the University of Missouri–Columbia Hospital, where it was determined that said child was suffering from subdural hemorrhaging. Further, it was the opinion of the admitting physician ... that the hemorrhaging was a result of trauma suffered from an act of abuse."

The petition regarding the male child further alleged:

2. According to our calculations, that is 7.28 pounds avoirdupois.

"On or about the 4th day of April, 1994, [the male child], who resides in the custody of his natural mother, [M____ H____] and her boyfriend, Jason ..., reported to his maternal grandmother and personnel from the Division of Family Services and the Camdenton Police Department, that he had been subjected to sexual contact by Jason ..., to-wit: [the male child] was made to perform oral intercourse with Jason ... at the family's apartment in Camden County, Missouri."

The petitions regarding C____ and the male child stated the children were in the custody of DFS.[3]

On April 6, 1994, the day the petitions were filed, the juvenile court entered an order placing each child in foster care under supervision of DFS. At that time, M____ was still hospitalized.

On July 7, 1994, the juvenile court appointed lawyer Gene A. Hilton to represent Appellant.

On August 11, 1994, Hilton, on behalf of Appellant, filed a request for a hearing regarding each child. Each request averred Appellant had repeatedly asked for a hearing to review the circumstances upon which the children were taken into custody and to determine whether the children are without proper care, custody and support.

On October 4, 1994, Hilton, on behalf of Appellant, filed motions to dismiss all three petitions. The motions averred, among other things, that the allegations of the petitions were insufficient to vest the juvenile court with jurisdiction over the children, hence the orders of April 6, 1994, were void. Each motion also averred that the juvenile court failed to issue a summons to either parent and failed to conduct a hearing on the petitions, consequently the juvenile court had no jurisdiction over any child. Each motion further averred that because of the above flaws (and others), and because of the lack of a hearing, Appellant had been denied due process of law.

The trial court overruled the motions October 11, 1994.

On October 20, 1994, Respondent filed an amended petition regarding each child. The amended petition pertaining to M____ was essentially the same as the original, but with an additional averment that M____ was hospitalized while in the care and custody of Appellant and Jason.

The amended petition pertaining to C____ was essentially the same as the amended petition pertaining to M____, except that the amended petition pertaining to C____ averred she resided in the same household as M____ and was subject to the same environment, and was therefore at risk for similar abuse.

The amended petition pertaining to the male child had two counts. The first count was essentially the same as the amended petition pertaining to C____, except that it pled the male child was the half-brother of M____. The second count averred there had been sexual contact between the male child and Jason.

On November 9, 1994, the juvenile court held a hearing on the amended petitions. Appellant appeared in person and with lawyer Hilton. Jason appeared in person and with counsel. A guardian ad litem for the children appeared, as did Respondent and her lawyer.

At the outset of the hearing, Hilton, on behalf of Appellant, objected to the amended petitions on the ground that no copies had been served on Appellant and he had not seen copies until the afternoon of November 8.

Although there were summonses dated October 12, 1994, commanding Appellant to appear November 9, 1994, for the hearing, the returns on the summonses showed they were not served until November 7, 1994 (two days before the hearing). Furthermore, Appellant asserted the service was invalid because it was made on Lilly at Lilly's apartment, not on Appellant.

3. At trial, Appellant testified C____ and the male child were removed from her custody April 4, 1994.

The juvenile court found the service was invalid and quashed the returns on the summonses. However, the juvenile court further found that by appearing at the hearing, Appellant waived service of summons per Rule 115.06.[4]

The juvenile court found Appellant would not be prejudiced if the court permitted Respondent to proceed on the amended petitions in that the "substantive facts" alleged in the original petitions were unchanged in the amended petitions. The court explained: "I don't see any reason for a continuance because there's nothing changed that would show that there would be any change in her having to prepare for what's charged against her."

Hilton replied: "Your Honor, I'm not requesting a continuance, I do not want a continuance."

The juvenile court thereupon ruled it would "allow the filing" of the amended petitions.

Hilton, on behalf of Appellant, then moved the juvenile court to dismiss the amended petitions on the ground that their allegations were insufficient as a matter of law to vest the court with jurisdiction over the children. Specifically, argued Hilton, the petitions failed to allege what Appellant did or failed to do, or how she was negligent or abusive.

The juvenile court denied the motion and proceeded with the hearing. At the conclusion of the jurisdictional phase, the court held there was no clear and convincing evidence supporting the second count of the amended petition pertaining to the male child (the count averring sexual contact between that child and Jason), so the court dismissed that count.

The juvenile court found: M____ was in the care and custody of Appellant and Jason when she was hospitalized March 31, 1994; M____ was fine when Appellant went to bed the preceding evening, but would not eat when Appellant arose at 5:30 or 6:00 a.m.; Jason had taken care of M____ overnight;

M____ was suffering from subdural hemorrhaging and the shaken baby syndrome upon arrival at the hospital; M____ is blind, may be unable to walk, and her prognosis is poor. The juvenile court took jurisdiction of M____ under § 211.031.1(1)[5] for "abusive acts."

As to C____, the juvenile court repeated its findings regarding M____ and further found that when one sibling is abused, the court has the right to remove all other siblings in the home because they are at risk. The court took jurisdiction of C____ under the same statute as M____.

The juvenile court took jurisdiction of the male child on the same basis as it took jurisdiction of C____.

We first address Appellant's second point. It asserts the juvenile court erred (a) on October 11, 1994, when it denied Appellant's written motions to dismiss the original petitions, (b) on November 9, 1994, when it denied Appellant's verbal motion to dismiss the amended petitions, and (c) when it took jurisdiction of the children at the conclusion of the jurisdictional phase of the hearing. Appellant maintains those rulings were erroneous in that no summonses were issued to her as to the original petitions and she was never served with those petitions, and neither she nor her lawyer were served with the amended petitions.

As we have seen, summonses dated October 12, 1994, were issued commanding Appellant to appear for the hearing November 9, 1994. On October 12, 1994, the amended petitions had not yet been filed. The only petitions on file as of October 12, 1994, were the original petitions. However, by the time the effort was made to serve the summonses on Appellant (November 7, 1994), the amended petitions were on file. According to exhibits in the legal file, copies of the amended petitions, not the original petitions, were attached to the summonses. It is thus inferable that the summonses were placed in the hands of the serving officer sometime after

---

4.  Rule 115.06.b, Rules of Practice and Procedure in Juvenile Court (1994), reads: "Appearance at the hearing by a custodian shall constitute a waiver by the custodian of service of summons."

In this opinion, references to rules are to the 1994 version.

5.  Footnote 1, *supra*.

October 20, 1994, the date the amended petitions were filed.

However, we need not speculate about that because the juvenile court quashed the returns of service on the summonses. Respondent tacitly concedes that the effect of that ruling is that no summonses were ever served on Appellant. Respondent also concedes that neither Appellant nor lawyer Hilton were ever sent copies of the original petitions or the amended petitions.

■ Citing §§ 211.101 and 211.111 and Rules 115.01 and 115.02, Appellant insists that summons must be issued to, and served upon, a custodial parent. Relying on *In Interest of D.L.D.*, 701 S.W.2d 152 (Mo.App. W.D.1985), Appellant argues that because of the failure to serve her, the juvenile court was without jurisdiction to enter the judgments wherein it took jurisdiction of the children.

Appellant's reliance on *D.L.D.* is misplaced. There, a juvenile officer and a child's guardian ad litem appealed from an order denying a petition for termination of the parental rights of the child's parents. 701 S.W.2d at 154. One of the grounds upon which termination was sought was that the child had been within the jurisdiction of the juvenile court for one year immediately preceding the filing of the termination petition and the parents had failed to rectify the conditions that formed the basis for juvenile court jurisdiction. *Id.* at 155.

The child was originally taken into custody upon the filing of a petition by the juvenile officer alleging the child was neglected and thus within the juvenile court's jurisdiction under § 211.031, RSMo Supp.1980. *Id.* at 154. No summons was ever served on either parent and no evidentiary hearing on the neglect petition was ever held. *Id.* at 158. Those flaws were one reason the trial court denied the termination petition.

The appellate court held that although the juvenile court had jurisdiction to authorize the juvenile officer to take custody of the child immediately upon filing of the neglect petition, that did not eliminate the court's duty to issue summonses to the parents and to conduct a hearing on the neglect petition. *Id.* at 159[12]. The opinion explained: "[T]he juvenile court had jurisdiction of the subject matter, but until there had been a summons and hearing on the [neglect] petition, it did not have jurisdiction to later enter a judgment terminating parental rights." *Id.* at 159[13]. That is because there was never a valid judicial determination of the conditions which formed the basis of the neglect petition. *Id.* at 160[14]. Inasmuch as the conditions of neglect and the transfer of custody were never established by anything other than the neglect petition, those conditions could not be a basis for terminating the parents' rights. *Id.*

There is a fundamental difference between *D.L.D.* and the instant case. Here, the juvenile court conducted an evidentiary hearing on the issue of jurisdiction pursuant to Rule 119. Appellant appeared in person and with court-appointed counsel, confronted and cross-examined the witnesses called by Respondent, and presented evidence in response to Respondent's evidence. Thus, there was an adversary proceeding and a judicial determination of the conditions upon which the juvenile court took jurisdiction of the children. That essential step was missing in *D.L.D.*

We decline to hold that the failure to serve a summons on Appellant deprived the juvenile court of authority to enter the judgments taking jurisdiction of the children. As reported earlier, the juvenile court applied Rule 115.06.b [6] and held that by appearing in person at the hearing, Appellant waived service of summons. That is exactly what the rule says.

Appellant argues that the trial court's ruling deprives a parent of a remedy for the absence of a summons because if a parent appears at a hearing and challenges the lack of service of summons, the parent is held to have waived the omission. Appellant asserts this should not be the law; however, she cites no authority for that contention.

The purpose of a summons is to notify a person of an action against him so he can

6. Footnote 4, *supra.*

appear and defend against it. *Hometown Lumber and Hardware, Inc. v. Koelling*, 816 S.W.2d 914, 916[3] (Mo. banc 1991). Appellant obviously knew the juvenile court had placed custody of her three children with DFS. Appellant testified she was at Respondent's office "every day wanting my kids, wanting a court hearing, wanting a lawyer, wanting some kind of results."

The motions to dismiss filed on Appellant's behalf by lawyer Hilton on October 4, 1994, challenged the sufficiency of the original petitions, attacked the juvenile court's jurisdiction because no summonses had been issued and no hearing had been held, and claimed Appellant had been denied due process. Appellant and Hilton appeared for the November 9, 1994, hearing and it is evident from the transcript that they were fully aware of the issues to be determined. Hilton was well prepared, as reflected by his cross-examination of Dr. Sotiropoulos, DFS worker Dryer, and a physician who examined the male child for indicia of sexual abuse. Hilton's familiarity with the case is further confirmed by his statement that he did not want a continuance.

The circumstances listed in the two preceding paragraphs show Appellant can demonstrate no prejudice from the absence of summons and service. We hold the trial court did not err in its application of Rule 115.06.b.

■ There is likewise no showing of prejudice in the failure to serve copies of the original petitions on Appellant and the failure to serve copies of the amended petitions on her and Hilton. The motions to dismiss filed by Hilton on October 4, 1994, establish he was well aware of the allegations of the original petitions, and his verbal motion to dismiss the amended petitions at the outset of the evidentiary hearing establish he was likewise aware of the allegations of the amended petitions. The attacks Appellant makes on the petitions in her first point (addressed *infra*) are the same ones she made at the outset of the evidentiary hearing.

We therefore find no basis for reversal in Appellant's second point. However, that does not signify our endorsement of the unexplained derelictions about which the second point complains. Why court officers ignore such procedural requirements is beyond our comprehension. Such omissions create serious, and easily preventable, issues for appeal.

We next consider Appellant's first point. It maintains the juvenile court erred when it (a) initially removed custody of the three children from Appellant and placed them with DFS, (b) denied Appellant's written motions to dismiss the original petitions on October 11, 1994, (c) denied Appellant's verbal motion to dismiss the amended petitions on November 9, 1994, and (d) took jurisdiction of the children at the conclusion of the jurisdictional phase of the hearing. Appellant argues those rulings were erroneous in that "the allegations of the petitions on which those orders were based were insufficient, as a matter of law, to vest the court with jurisdiction over the children in that the allegations failed to put Appellant on notice as to the charges of neglect brought against her or what specific acts had been committed by [her] that constituted neglect of [M___] or the other children."

■ We begin our consideration of Appellant's first point by noting one of the alleged errors is the juvenile court's initial placement of the children with DFS on April 6, 1994, yet the notice of appeal states this appeal is taken from the judgments of November 9, 1994, in which the juvenile court took jurisdiction of the children and entered orders of disposition as to each.

None of the three cases cited by Appellant in support of her first point holds that a juvenile court order taking a child into protective judicial custody per Rules 111.01, 111.02 and 115.03 can be attacked in an appeal from a judgment entered after a formal hearing per Rule 119. It appears to us that any error in taking a child into protective judicial custody becomes moot when a juvenile court ultimately takes jurisdiction after a Rule 119 hearing. However, we need not grapple with that issue because, as henceforth explained, we find no merit in Appellant's claim that the original petitions and the amended petitions were deficient.

■ Appellant bases her first point on § 211.091.2(1) which provides that a petition shall set forth plainly the facts which bring the child within the jurisdiction of the juvenile court, and Rule 114.01.b(3), which provides that a petition shall set forth plainly and concisely, with reasonable particularity, the facts which bring the child within the jurisdiction of the juvenile court, "including the date, place and manner of the acts alleged and the law or standard of conduct, if any, allegedly violated by the acts[.]"

Appellant maintains the original petition as to M____ did not meet those requirements in that it did not allege the date the abuse occurred, the place where or manner in which it occurred, or who inflicted it. According to Appellant, the petition "did not allege that [Appellant] or any other named person had neglected the child or what specific acts had been committed by [Appellant], or anyone else, that constituted neglect by [Appellant]."

■ Appellant's theory of error suggests she believes that in order to be sufficient, the petition regarding M____ had to charge a specific person with inflicting the brain injury. That is a misconception. As emphasized in *In re D.L.W.*, 530 S.W.2d 388, 391 (Mo. App.1975), where a juvenile officer prays a juvenile court to take jurisdiction of a child because the child has been injured while in the parents' custody, it is unnecessary to prove, as in a criminal case, whether the parents actually inflicted the injury or whether such injury was inflicted by someone else. The opinion explains:

> "This is not a criminal proceeding and so the niceties of proving precisely who committed the act is not a necessary ingredient in determining whether or not the juvenile court should assume jurisdiction over this child. The sole question for determination is whether or not the environment of this child was injurious to its welfare. When intentional injuries are inflicted as they were in this case, then the answer to the question before the court becomes self-evident.
> 
> The nature and extent of the injuries and the fact such injuries were admittedly intentionally inflicted, constitutes more

than substantial evidence to support the court's finding that the environment of this child is injurious to its welfare and to justify the court in assuming jurisdiction of such child." *Id.*

Appellant relies on three cases to support her first point. The oldest is *M.R.H. v. McElroth*, 622 S.W.2d 15 (Mo.App.E.D.1981), where a petition alleged a child who was in her mother's custody was without proper care, custody or support in that the child was diagnosed on a particular date as suffering from developmental deviation. *Id.* at 16. In holding the petition insufficient, the Eastern District of this Court pointed out that even if such condition was one requiring care, there was no allegation that the condition arose due to the mother's neglect or that it could have been corrected if the mother had taken appropriate measures. *Id.* at 17.

In contrast, the petition regarding M____ alleged that on March 31, 1994, while residing with Appellant and Jason, M____ was hospitalized and it was determined that she was suffering from subdural hemorrhaging caused by trauma suffered from an act of ·abuse. That is a specific allegation of an explicit injury caused by physical abuse and requiring hospitalization on a particular date. It clearly avers that M____, while in the custody of Appellant and Jason, did not receive proper care and was thus in need of care and treatment by the juvenile court. We hold the petition regarding M____ was sufficient to authorize the juvenile court's order of April 6, 1994, taking protective judicial custody of M____. Rules 111.01, 111.02 and 115.03.

In so deciding, we do not overlook the other two cases cited by Appellant in support of her first point: *In Interest of C.J.A.A.*, 674 S.W.2d 266 (Mo.App.W.D.1984), and *In Interest of D.J.B.*, 718 S.W.2d 132 (Mo.App.S.D. 1986). In the former case, a petition alleging only that a child's custodian failed to provide a physically safe and emotionally sound environment for the child was held insufficient. 674 S.W.2d at 267. In the latter case, a petition alleging only that the behavior, environment or associations of the child are injurious to his welfare or to the welfare of others in that "on the 2nd day of July, 1978,

at and in the City of Poplar Bluff, ... said child did become neglected ..." was held insufficient. 718 S.W.2d at 133. The difference between the petitions in those cases, which pled no facts, and the petition regarding M____, which pled she received a specific (and grave) injury caused by physical abuse and was hospitalized therefor on a particular date, is obvious. *C.J.A.A.* and *D.J.B.* do not aid Appellant.

The same reasoning applies to Appellant's attack on the petition regarding C____. It repeated the allegations regarding M____ and averred C____ also resided with Appellant and Jason. Abuse of another child is prima facie evidence of imminent danger to a sibling in the same circumstances so as to justify intervention by a juvenile court for removal of the sibling from such environment. *D.D.H.*, 875 S.W.2d at 188[4]; *In Interest of W.J.D.*, 756 S.W.2d 191, 196 (Mo. App.S.D.1988). The petition regarding C____ was sufficient to authorize the order of April 6, 1994, taking protective judicial custody of her.

We also find the petition regarding the male child sufficient to authorize the protective judicial custody order of April 6, 1994, as to him. The petition alleged the male child, who resided with Appellant and Jason, reported to authorities on April 4, 1994, that he had been made to perform oral intercourse with Jason. This was at least sufficient to authorize protective judicial custody pending further investigation. Whether it would have been sufficient for a finding of jurisdiction after a Rule 119 hearing is moot because, as noted earlier, the juvenile court held there was no clear and convincing evidence of sexual contact between the male child and Jason.

What we said about the original petition regarding M____ applies with equal force to the amended petition regarding her. The amended petition was essentially the same as the original, but with an added averment that M____ was hospitalized while in the care and custody of Appellant and Jason. We hold the amended petition was sufficient to support the juvenile court's taking of jurisdiction over M____ under § 211.031.1(1).[7]

We reach the same result as to the amended petitions regarding C____ and the male child. The amended petition regarding C____ was essentially the same as the original, but with an added averment that she resided in the same household as M____ and was subject to the same environment, and was consequently at risk for similar abuse. The reasons which supported our holding that the original petition regarding C____ was sufficient amply support our holding that the amended petition regarding her was sufficient. For the same reasons, we hold the first count of the amended petition regarding the male child, which essentially mirrored the amended petition regarding C____, was sufficient. Appellant's first point is denied.

Appellant's third point maintains the evidence was insufficient to support the juvenile court's findings that it had jurisdiction over the children under § 211.031.1(1)[8] in that "there was no evidence that the children were in need of care and treatment and that such need had arisen because Appellant had neglected or refused to provide proper support and care necessary for the children's well-being." As we understand Appellant's contention, her premise is that because there was no evidence that *she* inflicted M____'s brain injury, the juvenile court was powerless to take jurisdiction of the children.

That notion is refuted by *D.L.W.*, 530 S.W.2d 388, where a two-month-old child was hospitalized and found to have fractured ribs, a fractured tibia, and bruises on her head and back. The parents denied responsibility for the injuries and blamed them on a babysitter. As set forth earlier in this opinion, *D.L.W.* held the issue in a neglect case is whether the environment of the child is injurious to its welfare, and where intentional injuries are inflicted the answer is yes. 530 S.W.2d at 391. Infliction of the injuries in *D.L.W.* was held sufficient to warrant a juvenile court taking jurisdiction of the child, irrespective of whether the parents or the baby-sitter inflicted them. *Id.*

As we have seen, the juvenile court in the instant case found M____ was injured

---

7. Footnote 1, *supra.*

8. Footnote 1, *supra.*

when Jason was caring for her while Appellant slept. At the conclusion of the dispositional phase of the hearing, the juvenile court found there was no evidence that Appellant caused the harm or knew it was occurring, and no evidence that Appellant was neglectful in getting medical attention once she knew there was a problem.

Seizing upon those findings, Appellant cites *In Interest of Dimmitt,* 560 S.W.2d 368, 371–72[4] (Mo.App.1977), for the proposition that in order to vest a juvenile court with jurisdiction over a child under § 211.031.1(1), it must be proved that the child's need for care and treatment arose because the natural parent neglected or refused to provide necessary care for the child's well-being. Appellant declares the juvenile court's findings confirm there was no such proof as to her.

*Dimmitt* did not involve a child who was injured while in the custody of its parents. The allegation there was that the father failed to pay child support, and the issue was whether that failure authorized the juvenile court to take jurisdiction of the children on the basis of neglect. *Id.* at 369–70. The passage from *Dimmitt* relied on by Appellant addressed that issue and must be considered in that context. It does not apply here. The instant case is governed by *D.L.W.,* not *Dimmitt.*

While it may appear to Appellant that she is being punished by losing custody of her children because of the brain injury to M____ inflicted by Jason, we point out that the children were not taken from the household to punish Appellant, but instead for their protection. That is demonstrated by the juvenile court's decision on disposition regarding the male child. The court found Jason was no longer living with Appellant and ordered immediate return of the male child to Appellant, with legal custody to remain in DFS. The court further ordered that Jason have no contact with the male child.[9]

Under *D.L.W.,* 530 S.W.2d 388, the brain injury inflicted on M____ while she was in the care and custody of Appellant and Jason was sufficient to authorize the juvenile court to take jurisdiction of M____, and under *D.D.H.,* 875 S.W.2d 184, and *W.J.D.,* 756 S.W.2d 191, the presence of C____ and the male child in the same household was sufficient to authorize the juvenile court to take jurisdiction of them. Appellant's third point is denied.

Appellant's fourth, and final, point asserts the juvenile court lacked jurisdiction to enter the judgments wherein it took jurisdiction of the children in that no summonses were issued on the original petitions, Appellant was never served with those petitions, and no timely hearing was held on them.

We have already considered the lack of summonses and service of the petitions in our adjudication of Appellant's second point. What we said there need not be repeated.

The seven-month delay between the taking of the children into protective judicial custody and the Rule 119 hearing is worrisome; however, we find no authority—Appellant admits she found none—which holds such a delay deprives a juvenile court of jurisdiction where, as here, the jurisdictional facts are established by clear and convincing evidence at a Rule 119 hearing. Any discussion in this opinion regarding the steps Appellant might have taken to compel the juvenile court to hold an earlier hearing would be beyond the scope of the fourth point, and thus dictum.

Finding no authority to support Appellant's fourth point, we hold it presents no ground for reversal. The judgments regarding all three children are affirmed.

PREWITT, P.J., and PARRISH, J., concur.

---

9. The disposition regarding C____ was that she remain where placed by DFS "until such time as [Appellant] can obtain some parenting classes." However, the juvenile court added: "[T]he Court envisions [C____] being returned within two (2) months." The disposition regarding M____ was that she remain where placed by DFS "until such time as [Appellant] can make arrangements to provide for [M____'s] care." The juvenile court added: "The Court envisions this to take place by Christmas. Until such time, [DFS] shall allow [Appellant] visitation with the child at least weekly, preferably 3 times a week."