64 S.W.3d 907 (2002)
In the Interest of N.B., a child under seventeen years of age,
L.B., Appellant,
v.
Jasper County Juvenile Office, Respondent.
No. 24038.
Missouri Court of Appeals, Southern District, Division Two.
January 24, 2002.
*909 William J. Fleischaker, of Roberts, Fleischaker, Williams, Wilson & Powell, of Joplin, for appellant.
James Calton, of Joplin, for respondent.
JAMES K. PREWITT, Judge.
L.B. ("Mother") appeals from a finding of jurisdiction and judgment of disposition dated December 5, 2000, of the Circuit Court of Jasper County, Juvenile Division, which found it had jurisdiction pursuant to § 211.031 and that it would be contrary to the welfare of N.B. ("the child") for the child to be returned to Mother and ordered the child be placed in the care and custody of the Division of Family Services (DFS) in foster care placement.[1]
The child was born on December 18, 1998, in Newton County, Missouri, approximately four weeks premature at a weight of just over four pounds. Dr. John Kelly, who was the first doctor Mother saw at the hospital, doubted Mother's claims that she had seen another doctor for prenatal care, noted Mother talked "incessantly" about legal battles in the court system, and wrote in his notes that Mother either had "suffered greatly at the will of the ... system ... or she is mentally ill." In Dr. Kelly's opinion, Mother needed some sort of psychiatric evaluation to determine whether she was "capable of managing a newborn." Another doctor who saw Mother and the child, Dr. Frederick Stidman, agreed that the situation would benefit from an evaluation. Vicky Cupp, a maternal child social worker employed by the hospital, conducted the evaluation.
Mother told Ms. Cupp that she had been living at Souls Harbor mission in Joplin for two weeks, was planning to travel to Kansas City to address a court situation involving her own mother, and had made arrangements to stay at a Salvation Army shelter after the child was born. Ms. Cupp made several phone calls to verify information from Mother and established that Mother did have accommodations at Souls Harbor and the Salvation Army. Ms. Cupp also called the living center in which Mother's mother resided and learned that Mother allegedly could not see her mother without supervision. Ms. Cupp had concerns that Mother and the child would not receive appropriate follow-up care based on the child's premature birth, low birth weight, and difficulty feeding, as well as Mother's stated intention to travel to Kansas City in the middle of winter. Because of those concerns, Ms. Cupp wanted to get the DFS or juvenile office involved.
Ms. Cupp actually contacted the DFS before the child was born and was told to hotline the baby for a newborn crisis assessment once he was born. A Newton County DFS worker, Diane White, responded to that newborn crisis assessment request on December 19, 1998. Information Ms. White obtained from Mother was similar to that obtained by hospital officials, including that Mother intended to travel to Kansas City (hitchhiking, if necessary), Mother appeared obsessed with the legal battle surrounding her own mother's guardianship, and Mother had an "extreme distrust" of the DFS. Ms. White testified that although she was concerned with Mother's plan for housing, she was not as concerned with Mother's homelessness as she was with Mother's overall mental state and the child's health.
Ms. White requested that the juvenile office become involved with the case and *910 provided information she obtained to Patrick Stuart, a deputy juvenile officer for the 40th judicial circuit. Mr. Stuart took that information and completed a form 33, an order under which the child could be taken into emergency protective custody with the DFS. That order and the case were given to Bea Watson, the chief deputy juvenile officer for the 40th judicial circuit.
On December 22, 1998, Ms. Watson filed a petition asking the Circuit Court of Newton County, Juvenile Division, to place the child in the legal custody of the court and the Newton County DFS for suitable placement. In the petition, filed pursuant to § 211.031.1, RSMo Supp.1998, Ms. Watson noted Mother was homeless and alleged that "the parents or persons legally responsible for the care and support of the infant have neglected, failed, refused, or [were] unable to provide the care and support necessary for his well being." The petition claimed action by the court was necessary because the child was born premature, a poor feeder, and at risk in inclement and cold weather. Further, the petition argued that the child's chances of survival were minimal because Mother was homeless and transient and her behavior indicated possible psychological problems. The petition also referenced Dr. Stidman's opinion that the child would benefit from protective services.
On December 23, 1998, the Circuit Court of Newton County, Juvenile Division, filed an order of protective custody, citing the reasons outlined by Ms. Watson. The court found that an emergency situation existed and that the child "should be detained under the custody of this [c]ourt and [DFS] at a suitable placement pending further Order of this [c]ourt." On the same day, Mother filed a petition for dismissal that was overruled by the court. The child was placed in foster care, where he remained at time of hearing.
The jurisdictional hearing was originally set for February 8, 1999. On February 5, 1999, Mother filed several items pro se including a petition against mental evaluation; a petition for counter suit against the DFS and the Division of Aging, as well as several named staff members; a motion to remove the judge; a motion to remove the chief deputy judicial officer; a request to set the case for hearing; and a request for continuance. The motion for change of judge was sustained on February 8, 1999, and the Circuit Court of Newton County, Juvenile Division, recused itself on February 9, 1999, because the presiding judge to whom the case was transferred was a named defendant in a prior lawsuit filed by Mother. On March 1, 1999, the Missouri Supreme Court transferred a judge from the 29th judicial district to handle the case.
On March 9, 1999, Ms. Watson filed a motion to transfer proceedings to the Circuit Court of Jasper County, Juvenile Division because Mother lived and worked in Joplin, the child was being transported to the Jasper County DFS office for visitation with Mother, and a Jasper County DFS worker had been assigned to the case and was working with Mother. On May 25, 1999, the order transferring the case to the Circuit Court of Jasper County, Juvenile Division was filed.
The chief juvenile officer for Jasper County filed a motion for psychological evaluation of Mother on June 8, 1999; that motion was sustained on June 30, 1999. According to the testimony of John Nicholas of the Jasper County DFS, over the course of several months prior to June 1999, Mother had been asked to submit to a psychological evaluation, but had refused. A DFS case plan dated October 1999 indicates Mother's continued reluctance to complete the psychological evaluation. *911 On November 24, 1999, pending motions were considered; a number involved issues already addressed and many of those filed on February 5, 1999 were dismissed or ruled as moot based on other court proceedings.
The court-ordered psychological evaluation was performed on February 1, 2000, by Judith Garrity, a licensed psychologist experienced in working with families with children. Her examination included the administration of the Minnesota Multiphasic Personality Inventory (MMPI) and the parent awareness skills survey, as well as a clinical interview. Ms. Garrity's interpretation of the MMPI included that "the lie scale was elevated[,]" indicating that Mother "was presenting herself in an improbably favorable light." The MMPI results also showed signs of immaturity, stubbornness, impulsiveness, and hypochondriasis. Mother also scored high on the cynicism scale, which was indicative of "[s]ome paranoia, [and] little respect for experts and authority figures." In Ms. Garrity's opinion, the results of the parenting awareness survey indicated Mother lacked real parenting experience, had a rigidity in her approach to the presented parenting situations, and had a tendency to interject "flashbacks from her past" to her responses that were "bizarre" and tangential to the situations presented. In the clinical interview, Mother indicated a history of "reported abuse to her mother, and threats to kill her sister, and alienation and estrangement from all family members." Mother also relayed information regarding various lawsuits she had filed.
Overall, Ms. Garrity concluded that Mother "fit the criteria for a delusional disorder, persecutory type .... [where] [t]he focus is often on some injustice that must be remedied by legal action, and the affected person may engage in repeated attempts to obtain satisfaction by appeal to the courts and other government agencies." According to Ms. Garrity, persons with this type of diagnosis do not respond well to psychological treatment and are often reluctant to participate in treatment or take medication. In Ms. Garrity's view, it would be difficult for Mother to parent the child because Mother would obsess on the delusion system, a focus that could lead her to neglect the child. Ms. Garrity testified that based on Mother's conduct and responses during the psychological evaluation, she would not have felt comfortable releasing the child to Mother for her to raise.
Because Mother was not satisfied with Ms. Garrity's evaluation, she was also seen by Dr. John Wade, a psychiatrist who reviewed Ms. Garrity's report and conducted a clinical interview. Dr. Wade evaluated Mother using the clinical interview and a mental status examination. He testified that he was unfamiliar with the parent awareness skills survey. Dr. Wade disagreed with many of Ms. Garrity's findings and diagnoses, but during testimony, he noted a diagnosis of schizotypal personality disorder was "a better diagnosis." When asked whether the parenting skills of a person who suffered from either a delusional or schizotypal disorder who also had "an obsession with a legal conspiracy" would be impaired, Dr. Wade indicated that such a combination "could actually impair their functioning in all major areas of life." Dr. Wade's report was not made available to the court and other parties to the action until the day of the jurisdictional hearing.
In addition to being asked to submit to a psychological evaluation, the DFS made various other requests of Mother including that she "obtain and maintain steady housing and demonstrate an ability to support her child." The DFS did believe Mother had a home and Mother also informed the *912 DFS that she had employment in January 1999, although she never complied with requests to provide the DFS proof of such employment beyond providing the DFS with a copy of a handwritten letter that was submitted to the court and signed by Mother indicating a change of address and a place of employment. An April 2000 case plan noted that until February 2000, Mother had refused to cooperate with DFS reunification efforts by refusing to allow home visits, to share personal information regarding her recent marriage and change of address, and to separate legal issues regarding the child and her own mother. According to Mr. Nicholas, Mother was provided various services, including referrals for psychological evaluations, psychiatric treatment, and parenting assessment, as well as a parent aide at the supervised visitations. However, aside from the parent aide, Mother declined all services until February 2000. According to DFS testimony, due to lack of cooperation and progress, the service provider later cancelled the parent aide. Mother also refused requests from the DFS to furnish a copy of Dr. Wade's psychological report.
Throughout the time the child was in DFS custody, Mother was allowed supervised visitation with him at the Jasper County DFS office on a weekly basis. Visits were initially twice per week for thirty minutes each, but were later switched to once a week for one hour. According to DFS representatives and parent aides, Mother was essentially consistent in her attendance, but spent much of the time during visitations talking about her ongoing legal battles and feelings of persecution by the DFS and others associated with those legal issues. DFS workers and parent aides saw no visible signs of bonding between Mother and the child, and the child at times seemed resistant to participate in the visitations.
According to exhibits provided to the court, permanency plans called solely for reunification until October 1999, when the permanency plan recommended adoption concurrently with reunification. Mother did present to the court an exhibit that showed the same October 1999 case plan with only adoption, and not reunification, listed. A case plan from April 2000 listed adoption as the only option.
On April 5, 2000, two motions were filed by Mother: a motion for return of custody and a motion for home study. The home study was conducted by the DFS in June 2000 and the report filed with the court on June 7, 2000 concluded that while Mother's home was physically suitable for the child, the DFS did not recommend custody be given to Mother.
A hearing was held on September 6 and December 5, 2000. At the close of the jurisdictional phase, the court found it had jurisdiction and proceeded with the dispositional stage. Within the dispositional phase, DFS representatives recommended that the child remain in DFS care and that the DFS be allowed to cease reunification efforts and discontinue visitation between Mother and child. The juvenile office and guardian ad litem concurred with that recommendation. The trial judge concluded that the DFS would retain custody in the current foster placement.
The trial judge issued a finding of jurisdiction and judgment of disposition dated December 5, 2000. In pertinent part, the judgment states the following:
Court finds that removal was made on an emergency basis. Court finds reasonable efforts after removal to include but are not limited to: general case management; supervision; Family Centered Out of Home Program; foster care; Medicaid; clothing; routine medical/dental/eye care; psychological evaluation and parenting assessment for the *913 mother; parent aid services; visitation supervised by the parent aid; financial assistance and referrals for transportation resources to facilitate visitation; individual counseling and psychiatric treatment for the mother; referrals for public assistance for the mother.
Court hears testimony and evidence on disposition. The court finds it would be contrary to the welfare of the minor child to be returned to the parent at this time.
It is therefore ORDERED and ADJUDGED in the best interest of said juvenile that said juvenile be placed in the care and custody of Division of Family Service in the foster care placement.
In an order dated December 6, 2000, the trial court ordered visitation between Mother and the child to cease and released DFS from further reasonable efforts.
Before addressing Mother's points on appeal, we first note that it has been previously established that the type of judgment before us is appealable. See In re C.A.D., 995 S.W.2d 21, 26-27 (Mo. App.1999). The standard for what represents a final judgment in a juvenile proceeding is different than it is for a general civil proceeding. See id. at 26. Although "[t]he very nature of a juvenile proceeding entails an on-going case which does not result in a `final' order, .... [t]he juvenile court's exercise of continuing jurisdiction over a child ... does not defeat a right to appeal." Id. at 26-27. "Once a disposition has been made, all the issues before the juvenile court have been disposed and nothing has been left for future determination, and the judgment is final and appealable." Id. at 27. Mother appeals a finding of jurisdiction and judgment of disposition pursuant to the provisions of §§ 211.031 and 211.183. "An appeal shall be allowed to a parent from any final judgment, order or decree made under the provisions of this chapter which adversely affects him [or her]." § 211.261.1, RSMo Supp.1998. Thus, we proceed to consider Mother's points.
Mother makes three points on appeal: 1) that the court's finding of jurisdiction was erroneous because the record fails to establish clear, cogent and convincing evidence that Mother neglected or refused to provide proper support, education, medical, or other care for the child; 2) that the court's judgment of disposition was erroneous because it failed to comply with requirements of § 211.183, RSMo Supp.1998, relating to preventative and reunification efforts; and 3) that the judgment of disposition was erroneous because it is not supported by clear, cogent and convincing evidence sufficient to comply with § 211.183.
Although we address all of the points, we discuss Mother's second point first, for it has merit. In this point, Mother claims the judgment of disposition is defective because it fails to comply with the requirements of § 211.183, RSMo Supp.1998. Specifically, Mother argues the judgment of disposition does not support the determination that reasonable efforts were made by the DFS because it fails to include a brief description of preventative or reunification efforts made by the DFS and fails to provide an explanation of the effect of further efforts on the prevention or shortening of the separation of the child from Mother. Mother is correct that the language of the statute requires that an order of disposition include the elements that she claims are missing. See § 211.183.3, RSMo Supp.1998. "In support of its determination of whether reasonable efforts have been made, the court shall enter findings, including a brief description of what preventative or reunification efforts were made and why further efforts could or could not have prevented *914 or shortened the separation of the family." Id.
Within the finding of jurisdiction and judgment of disposition here, which in pertinent part is stated above, the court determined that the DFS made reasonable efforts and listed more than ten such efforts. While the listing by the court of the reasonable efforts of the DFS partially meets the requirements of the statute, case law notes that "the finding[s] must be articulated, and even explained." In Interest of A.L.W., 773 S.W.2d 129, 133 (Mo. App.1989); see also In Interest of K.L.B., 898 S.W.2d 696, 701 (Mo.App.1995). Even assuming the listing in part meets the criteria of the statute, the complete requirements call for the court to enter findings, which include "a brief description of what preventive or reunification efforts were made and why further efforts could or could not have prevented or shortened the separation of the family." § 211.183.3, RSMo Supp.1998. Even though Respondent argues jurisdiction was obtained and removal made on an emergency basis, that does not release the court from the requirements of § 211.183.5, at least to the extent possible. See In Interest of B.R.M., 912 S.W.2d 86, 89 (Mo.App.1995).
We reverse and remand on this point and find that the judgment of disposition is defective in that it does not fully comply with the requirements of § 211.183 and remand back to the trial court with directions for it to issue a judgment that does so comply.
Mother makes two other points, the first of which is that the trial court erred in finding it had jurisdiction over the child pursuant to § 211.031, RSMo Supp. 1998, because the record fails to establish clear, cogent and convincing evidence that Mother was neglecting or refusing to provide other necessary care to the child. Mother argues that she had maintained a stable residence and employment, the home study found her home to be acceptable, she engaged in regular weekly visitation with the child, and the mental illness of a parent is not per se harmful.
Our review is the same for juvenile cases as it is for a court-tried civil case. See In Interest of M.R.F., 907 S.W.2d 787, 789 (Mo.App.1995). We will sustain the judgment "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." Id. The facts and reasonable inferences are considered "in the light most favorable to the juvenile court's judgment." Id.
The trial court found jurisdiction under the provisions of § 211.031.1(1)(a), which states in pertinent part that the court shall have jurisdiction when a minor "is alleged to be in need of care and treatment because ... [t]he parents, or other persons legally responsible for the care and support of the child ... neglect or refuse to provide proper support, education which is required by law, medical, surgical or other care necessary for his or her well-being." § 211.031.1(1)(a), RSMo Supp.1998. In a case where the court takes jurisdiction based on § 211.031.1(1), "because the child is in need of care and treatment, the standard of proof is clear and convincing evidence." M.R.F., 907 S.W.2d at 789.
The clear, cogent and convincing standard is met when the evidence "instantly tilts the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." In re S.L.N., 8 S.W.3d 916, 920 (Mo.App.2000). The standard does not contemplate only affirmative evidence or "the absence of conflicting evidence." *915 Id. When conflicting evidence is present before the trial court, we review such evidence "in a light most favorable to the trial court's order." Id. Overall, "[t]he paramount consideration is the welfare of the child." M.R.F., 907 S.W.2d at 789.
We do not see quite as much conflict in the evidence as Mother implies. Mother was given psychological evaluations by Ms. Garrity and Dr. Wade. Dr. Wade, whom Mother chose to see after disagreeing with Ms. Garrity's report, contradicted Ms. Garrity's diagnoses and methods, yet during testimony he arrived at a diagnosis of schizotypal personality disorder. According to his testimony, a person who suffered from this disorder would generally face treatment difficulties and, if the disorder were combined with "an obsession with a legal conspiracy," the combination could impair a patient's functioning as a parent, as it could impair functioning in all major areas of one's life. Thus, while Dr. Wade's diagnosis was somewhat different from Ms. Garrity's, his prognosis of the results if a patient were resistant to seek treatment was similar to that of Ms. Garrity. Mother's own testimony laid a foundation for concern regarding resistance to treatment.
Mother testified that she was unwilling to seek treatment for any of the disorders represented by Ms. Garrity's or Dr. Wade's diagnoses, because she did not suffer from any disorder. When asked if she would seek treatment for schizotypal personality disorder, if it were determined that she had such a disorder, Mother responded, "They'll never give me back my child if I do." Although in later testimony Mother did seem to distinguish between receiving counseling and receiving treatment, stating she was open to counseling but adamantly opposed to treatment, Mother's resistance was apparent to the court.
Mother is correct and this Court agrees that "the mental illness of a parent is not per se harmful to a child." In re D.L.M., 31 S.W.3d 64, 69 (Mo.App.2000). Mother points to termination of parental rights cases that indicate the focus of the determination of whether to terminate a parent's rights should not be on the presence of a mental illness, but rather "on the ability of [M]other to care for [the child] and her ability to maintain a parental relationship with [Child] which would not be harmful to [the child]." Id. at 70. That is the same focus involved in a jurisdiction case. However, we agree with Respondent that Mother bears a responsibility of demonstrating that she is willing to correct deficiencies in her parenting ability. See In Interest of R.R.T., 744 S.W.2d 829, 832-33 (Mo.App.1988). So that there is no misunderstanding, the deficiency is not Mother's mental illness, but rather her resistance to acknowledge and seek/accept treatment for it so that she may become a healthy parent. Mother's own testimony provided the evidence necessary to meet the clear, cogent and convincing standard regarding the references to how her resistance to seek/accept help for her mental illness affected her ability to parent and would have provided an adequate basis for the court's finding of jurisdiction.
As for Mother's points on her stability of home, employment, and visitation, here, as well, the evidence met the clear, cogent and convincing standard. Consider the results of the home study. Mother is correct that it concluded that the home was physically suitable for the child. However, that conclusion also noted that the DFS did not recommend that Mother receive custody of the child, even though the physical home itself may have been acceptable. In terms of maintaining a stable home and employment, while Mother did provide documentation of both, the documentation of her *916 employment failed to be in the form required by the DFS, which might have included pay stubs, letter from employer, etc. In terms of visitation, the record does show that Mother regularly attended the visitations. However, the record also shows that her focus during the sessions was much more on her legal battles than on her own son.
The juvenile court's finding of jurisdiction was appropriate. It was backed by substantial evidence and that evidence met the clear, cogent and convincing standard on all issues noted. Mother's point is denied.
Mother's final point goes back to the judgment of disposition. Mother claims the judgment was erroneous because it is not supported by clear, cogent and convincing evidence in that the evidence fails to show that the DFS has used reasonable diligence to apply all available services to meet the needs of the child and the family to prevent the need for removal or to make possible the return of the child to Mother. Mother further claims that the DFS made no attempt to try to integrate the child into Mother's life and no effort to supervise visitations in Mother's home. Lastly, Mother argues the only reason put forth by the DFS for ceasing efforts at reunification was that the child had bonded with the foster parents and not Mother.
Our review of this point is the same as for the previous point. See M.R.F., 907 S.W.2d at 789. Despite Mother's contentions, it is not so much a lack of reasonable diligence or continued efforts that is of concern, but rather the extent to which Mother availed herself of the services offered by the DFS. See R.R.T., 744 S.W.2d at 832. The record is replete with the amount of services offered to Mother. According to testimony from DFS staff, Mother was provided various services, including referrals for psychological evaluations, psychiatric treatment, and parenting assessment, as well as a parent aide at the supervised visitations. The record also clearly shows Mother failed to take full advantage of many of those services.
In terms of the psychological evaluation, she delayed it even after it was ordered by the court. One of the services in which she participated was working with a parenting aide during the supervised visitations. However, the service provider later cancelled the parent aide due to Mother's lack of cooperation and progress. Exhibits before the court show how during visitations the parent aide would strive to facilitate Mother toward a focus on her child rather than a discussion about legal issues. All of those visits took place at the Jasper County DFS office. Regarding visits in Mother's home, DFS workers testified finances and caseload level precluded them from accommodating such a request. Further, the DFS was not comfortable with Mother having unsupervised visits in her home. Lastly, in terms of bonding, although the DFS did put forth evidence that the child had bonded with his foster parents and not Mother, and that the child was at times resistant to participate in the visitations, this was not the only evidence presented. The evidence of the lack of a bond between Mother and child was also related to other evidence regarding Mother's lack of focus on the child during the visitations.
A child is removed from his or her parent when deficiencies in the parent's ability or willingness to meet their responsibilities to the child are noted. The parent is then in the position of demonstrating his or her ability to correct these deficiencies. This is accomplished by conscientiously availing oneself of the services offered that should be reasonably calculated to correct the deficiencies.
*917 R.R.T., 744 S.W.2d at 832. In many ways, Mother's lack of cooperation and resistance to the services offered hampered the efforts of the DFS. This did not serve the best interests of the child. There was clear, cogent and convincing evidence presented to the juvenile court on which it appropriately found jurisdiction and issued the judgment of disposition. Mother's point is denied.
We reverse and remand with directions to the juvenile court to cure the defects in the judgment of the disposition to comply with § 211.183. In all other respects, the judgment is affirmed.
GARRISON, P.J. and PARRISH, J., concur.
NOTES
[1] In Mother's testimony, she names Child's father and he is listed in various court exhibits as the possible father. However, he is not a party to this case; his rights are not at issue and will not be discussed.