291 S.W.3d 306 (2009)
In the Interest of: M.N.J. & N.M.D.A.;
Juvenile Officer, Respondent,
v.
M.G. and C.G. (Mother), Appellants.
Nos. WD 70056, WD 70057.
Missouri Court of Appeals, Western District.
June 30, 2009.
*308 J. Eric Mitchell, Clinton, MO, for Appellant.
James E. Switzer, Clinton, MO, for Respondent.
Before ALOK AHUJA, P.J., HAROLD L. LOWENSTEIN, J., and THOMAS H. NEWTON, C.J.
THOMAS H. NEWTON, Chief Judge.
Stepfather and Mother appeal the juvenile court's judgment removing Mother's two minor children from their home and placing them with the Children's Division of the Missouri Department of Social Services. The Juvenile Officer petitioned the juvenile court for jurisdiction over each child, alleging that the children were in need of care and treatment because of physical abuse. The juvenile court determined that Stepfather abused the children by using excessive force in disciplining them and that Mother abused the children by not protecting them. Finally, the juvenile court decided that placement with the Children's Division was in the children's best interests. Stepfather and Mother argue on appeal that the juvenile court erred because the Juvenile Officer did not present clear and convincing evidence that they abused the children. We reverse and remand.

Factual and Procedural Background
On February 14, 2008, Ms. Mary Hill, a Children's Division investigator, went to a school to investigate a hotline report of an untreated burn on one of the children's hands. The child, M.J., was not at the school, so she spoke with the child's sister, N.A., about the burn. N.A. told Ms. Hill that M.J. was at home after she burned herself with hot soup that spilled on her hand while retrieving it from the microwave. During the interview, N.A. also stated that she was going to get whipped with a belt by "Daddy," Stepfather, because she spoke with "DFS."[1] Thereafter, Ms. Hill went to the M.J.s' residence with a police officer.
At the home, with Mr. Stepfather present, Ms. Hill observed M.J.'s bandaged hand. M.J. confirmed that she burned herself with hot soup. While still investigating the matter, Ms. Hill received a report from the school that N.A. had to be removed from the classroom because she was crying and saying that she was afraid of being spanked when she returned home. M.J. was removed from the home.
*309 Ms. Hill determined that the parents had taken M.J. to the hospital on different occasions but did not wait to receive treatment for the burn. Instead, they treated M.J.'s burn with a medicated cream. In Ms. Hill's opinion, the burn was not severe enough to require an emergency hospital visit, but she felt that a doctor should treat M.J.'s burn. Ms. Hill listed the hotline report of neglect as unsubstantiated, but she prevented the children from returning to the parents' home.
The children were not allowed to return to the parents' home because N.A. expressed fear of returning home to Stepfather after speaking with the Children's Division. When confronted with the news, Mother stated that she did not understand the child's fear of returning to the home. Mother consented to the children residing with their maternal grandmother until a child forensic interview could be completed.
On March 14, 2008, a case was opened by the Children's Division to reunite the family. On May 30, 2008, the Juvenile Officer sought protective custody of the children, which was granted. On June 4, 2008, the Juvenile Officer petitioned the juvenile court division of the circuit court of Henry County for custody of the two children, alleging they were in need of care and treatment because of abuse. Specifically, the Juvenile Officer alleged:
[I]n or about February 13, 2008 ... Children's Division conducted an investigation from three hotline reports for physical abuse to the child and her sibling by [Stepfather] and [M]other. ... [Stepfather] beat the children with a belt on several occasions, leaving bruises, tied their hands together with a rope and tied them to a tree. These hotlines were substantiated." Children's Division set the family up with a safety plan, the children were placed by verbal agreement with [maternal] grandmother. On May 30, 2008 CD has requested custody of both children. The children are afraid to return to [Mother's] home. Both [Stepfather] and [Mother] have refused to follow the safety plan and have made threats to the professionals involved in the case and the children's caretaker.
At a hearing in July 2008, the following evidence was presented through testimony from the grandmother, Mother, Ms. Hill, and other witnesses, but the children did not testify. On the evening the children were placed with their grandmother, the grandmother noticed a red mark on N.A. while preparing the children for baths. She noticed the red mark only after N.A. got off the toilet seat, and she did not observe any bruises. The grandmother reported to Ms. Hill that the red mark was probably from where the child sat on the toilet. Ms. Hill instructed her to have the doctor examine N.A. after he examined M.J.'s burn. In the morning, the mark had disappeared, which the grandmother related to Ms. Hill.
Subsequently, the children were interviewed by a forensic interviewer. According to Ms. Hill, each child told the interviewer in separate interviews that Stepfather disciplined them with a belt. Ms. Hill observed their fear when they spoke of being spanked with a belt for discipline.
In March 2008, Mother and Stepfather reported to the local police station at Ms. Hill's request to be interviewed about their discipline practices using a Computer Voice Stress Analyzer. However, the machine malfunctioned. Stepfather told the detective that he used a belt on the children in the past, about two or three months ago, but no longer did so. Mother claimed that she did not use the belt on the children, felt it would be inappropriate *310 to use a belt on the children, and that to use a belt would be harmful and injurious to the children. According to the detective, Mother initially denied that a belt had been used to discipline the children but later admitted that Stepfather had used a belt to swat the children's buttocks about two or three months ago.
Continuing with her investigation of suspected child abuse, Ms. Hill reviewed the family's record with the Children's Division. Ms. Hill noticed that there were previous hotline reports of abuse to the children in 2004 and 2005 against the grandmother and Mother. The children had previously been removed in 2005. Based on the history of allegations, Ms. Hill decided to open a case on the family with a goal of reunification. After informing N.A. that she and her sister would return home in the near future, N.A. assumed the fetal position, rocked back and forth, and repeated, "This is bad. This is very bad."
Mr. John Leonard, a Children's Division caseworker, was then assigned to the case and assisted in formulating the reunification terms in the written service agreement. The parents were to attend parenting classes, have individual counseling, submit to parental assessments, and undergo psychological evaluations. They complied with most of the terms but did not attend parenting classes because there were none available during the period of compliance. They attended counseling for a time but ended the sessions because Stepfather did not trust the counselor. They obtained a new counselor, but Mr. Leonard was no longer involved in the case before their first session started. They submitted to the parenting assessment on April 16, 2008.
Mr. David Dalby, a licensed clinical social worker, testified that the parenting assessments revealed that the parents needed to have psychological evaluations performed before the children should be returned. In separate sessions, he asked them about their life histories and then performed two tests on them: CAP (Child Abuse Potential Inventory) and PASS (Parent Awareness Skill Survey). Stepfather reported that he suffers from Explosive Anger Disorder and Bipolar Disorder and that he does not take his medications for the disorders. Stepfather also told Mr. Dalby that he had spanked the children with a belt. Mother reported that she had post-traumatic stress disorder, bipolar disorder, sleeping disorder, and stress issues, for which she takes medicine. Mother told Mr. Dalby that she and Stepfather stopped spanking because of conflicting messages about spanking from various professionals.
Mr. Dalby further testified that both performed well on the most important part of the PASS test. Yet, the CAP scores revealed that both could deal with children in a negative way. The test could not tell whether they had abused the children or would abuse the children, which is why he recommended psychological evaluations be performed. The parents subsequently submitted to psychological evaluations but refused to release the results to the Children's Division.
After one of the case hearings, Stepfather confronted Mr. Leonard in an angry manner. His voice was loud and his tone was aggressive, causing a coworker to enter the conference room. Upon the coworker remarking that Stepfather appeared to be out of control, Stepfather stated that if he lost control, they would know it. Mr. Leonard interpreted that as a threat, and proceedings were initiated to remove the children from the parents' custody.
At the end of the Juvenile Officer's evidence, Mother moved to dismiss the petition based on the fact there was no showing *311 of abuse or neglect by the evidence adduced at the hearing. The juvenile court denied the motion. Mother did not present any evidence. Subsequently, on August 21, 2008, the juvenile court determined that Stepfather and Mother abused the children.
Specifically, it found in its order and judgment that Stepfather had used excessive force when disciplining the children, and Mother had failed to protect them. It ordered them to release their psychological evaluations to the Children's Division and approved the permanency plan for reunification. It also noted in "Additional Jurisdictional Findings" that: the children expressed fear of returning to the home; Mother has been diagnosed with various psychological disorders, which could present difficulties for the mother in dealing with the care and protection of the children; Stepfather has anger control issues "and presents a potentially explosively violent nature"; and there "has been a past history of alleged incidents of abuse upon these children." Finally, the court stated: "This Court believes, based upon the evidence presented that this Court is not required to wait until further evidence of abuse arises before asserting jurisdiction for the protection of these children and this Court is not content to place these children in a potentially dangerous home environment with the mother and [stepfather]." Stepfather and Mother appeal.

Standard of Review
Upon our review of a juvenile court's judgment, "we will affirm the circuit court's decision unless it is not supported by substantial evidence, is against the weight of the evidence, or erroneously declares or applies the law." In the Interest of D.K.S., 106 S.W.3d 616, 618 (Mo. App. W.D.2003). We view the evidence and reasonable inferences therefrom in the light most favorable to the judgment. In the Interest of M.R.F., 907 S.W.2d 787, 789 (Mo.App. S.D.1995).

Legal Analysis
The parents assert in their sole point that the juvenile court's adjudicatory and dispositional hearing order and judgment is erroneous and against the weight of the evidence because the juvenile officer did not present clear and convincing evidence that the children had been abused under section 211.031.[2] Specifically, the parents argue that (1) abuse or neglect was not the reason for investigation and removal, (2) none of the evidence supported the petition's allegations of past abuse, and (3) the juvenile court erroneously exercised jurisdiction based on an existing potential for abuse.
The juvenile officer has the burden to prove by clear and convincing evidence that Mother or Stepfather abused the children as alleged in the petition. See D.K.S., 106 S.W.3d at 619 n. 1 (stating that clear and convincing is the burden of proof because the constitutional guarantee of due process mandates the standard). Clear and convincing evidence is that which "instantly tilts the scales in the affirmative when weighed against the evidence in opposition and leaves the fact finder's mind with an abiding conviction that the evidence is true." In re Interest of K.L., 972 S.W.2d 456, 458 (Mo.App. W.D.1998) (internal quotation marks and citation omitted). Direct evidence of abuse or neglect is not required to support a finding of abuse or neglect. M.R.F., 907 S.W.2d at 789. "The juvenile court, as a fact finder, may draw all reasonable inferences from the evidence and may base its findings upon such inferences." Id.
*312 The parents argue that no evidence was admitted at trial to support the allegations of abuse, especially the allegation that "[Stepfather] beat the children with a belt on several occasions, leaving bruises, tied [the children's] hands together with a rope and tied them to a tree." The parents further argue that the only evidence to support the allegation of past abuse is a "list of prior hotline calls" against the family, which was improperly admitted. The Juvenile Officer asserts that the record substantiated the finding of abuse by Stepfather absent the evidence of past abuse. The Juvenile Officer claims that the record supports the finding of abuse because "the focus of the investigation and of the presentation of evidence at trial was not on the prior histories but whether the children were subject to current abuse at the hands of mother and [stepfather]." Hence, the investigation focused on the use of the belt to discipline the children.
Abuse is defined as "any physical injury, sexual abuse, or emotional abuse inflicted on a child other than by accidental means by those responsible for the child's care, custody, and control, except that discipline including spanking, administered in a reasonable manner, shall not be construed to be abuse." § 210.110(1). Spanking with a belt is not physical abuse when done in a reasonable manner and does not result in harm to the child. See Holmes v. Holmes, 878 S.W.2d 906, 911-12 (Mo.App. E.D.1994); see also Johnson v. Johnson, 758 S.W.2d 721, 723, 726 (Mo.App. W.D. 1988) (finding spanking with belt for discipline did not amount to physical abuse without evidence of harm). At the hearing, Ms. Hill admitted that spanking with a belt only constitutes abuse when the child is harmed.
Although the parents admitted to disciplining the children with a belt and the children stated that Stepfather spanked them with a belt, there was no testimony that the children suffered from bruises because of those spankings with a belt or that the spankings were administered unreasonably. The only indication of harm resulting from a spanking was Ms. Johnson's observation of a red mark on one of the children's bottom, a statement from N.A. that Stepfather's whipping caused the mark, and a statement from M.J. that "Daddy spanked her with a belt." Ms. Hill testified that a bruise is a skin manifestation for more than a day and that a red mark could indicate abuse depending on the severity. She admitted that there were no signs of any severe use of a belt.
The Juvenile Officer claims that "regardless of whether the children were being swatted or beaten with the a belt and regardless of whether it left a red mark or bruising, the children's level of fear when advised of the prospect of returning to mother and [stepfather]'s home is a telling factor." The Juvenile Officer also asserts that this fear along with Mother's denial of using a belt and Stepfather's explosive anger disorder supports an inference that Stepfather used excessive force with the belt that left bruises on the children. As stated earlier, circumstantial evidence may be sufficient to support a finding of abuse. See M.R.F., 907 S.W.2d at 789.
The Juvenile Officer seems to suggest that the children's fear alone is substantial evidence of abuse, citing In re B.G.S., 636 S.W.2d 146 (Mo.App. W.D.1982), for support. However, B.G.S. does not support this contention. The children in B.G.S. were afraid of mother's boyfriend and had several noticeable bruises on their body. Id. at 148. The B.G.S. court found that mother's knowledge of this fear and of her boyfriend's previous spankings, and the noticeable bruises discovered by school officials over several days constituted *313 sufficient evidence that mother knew the children were being abused during the spankings and she neglected to protect them. Id. at 148. Thus, it was not the children's fear alone of the boyfriend but also the accompanying manifestations of harm that supported the finding of neglect in B.G.S. Moreover, in the present case, M.J. and N.A. were not afraid of Stepfather; Mr. Leonard testified that the children wanted to visit Stepfather during visits with their mother. Consequently, B.G.S. is inapposite.
Contrary to the Juvenile Officer's contention, the children's fear coupled with the other evidenceMother's denial of using a belt and Stepfather's alleged explosive anger disorderviewed in the light most favorable to the judgment does not show substantial evidence of abuse. Substantial evidence to support a finding of abuse is evidence so clear and convincing that it "instantly tilts the scales" in favor of finding the parents were guilty of abuse. In the Interest of G.C., 50 S.W.3d 408, 419 (Mo.App. E.D.2001) (Teitelman, J., concurring).
Mother's denial of using the belt to discipline the children may reflect a guilty conscience for using a belt as means of discipline. But the denial is not "clear and convincing evidence" that she abused or observed the children being abused, as opposed to being disciplined, with a belt. As for the evidence concerning Stepfather's alleged explosive anger disorder, evidence of this disorder does not "instantly tilt the scales" to compel a finding that he abused the children when he disciplined them with a belt. Cf. In the Interest of N.L.B., 145 S.W.3d 902, 908 (Mo. App. S.D.2004) ("Unlike neglect, abandonment, abuse, or nonsupport, the mental illness of a parent is not per se harmful to a child.") (internal quotation marks and citation omitted). Mr. Dalby testified that Stepfather's scores on the Child Abuse Prevention test were normal and suggested psychological evaluations be performed to explore his reported mental conditions. Given this lack of evidence to support a finding of present abuse, the dissent's meaning is unclear when it states that "the evidence is clear and convincing that the children have been subjected to abuse...."
We recognize that there is additional, disconcerting evidence in the record concerning Mr. and Mother's mental conditions, and the children's conditions and circumstances at home. We also recognize that the juvenile court made additional jurisdictional findings beyond the finding of abuse through use of excessive force in discipline based on this evidence. These additional findings, which could be supported in the record, could well support the exercise of jurisdiction under § 211.031. We nevertheless do not believe we can affirm the juvenile court's judgment based on its additional findings.
First, the juvenile court's finding of abuse through Stepfather's use of excessive force in discipline, and Mother's failure to protect the children from this abuse, was the principal basis upon which the juvenile court relied in order to assume jurisdiction of these children. We have concluded that, under the governing legal standards, that finding cannot be sustained on the evidence presented below. Second, we have no assurance that the juvenile court would have reached the same outcome in the absence of this central finding. Third, the additional jurisdictional findings were themselves influenced, at least to some degree, by the juvenile court's finding that abuse had occurred. The court emphasized in those findings that "this Court is not required to wait until further evidence of abuse arises before asserting jurisdiction"; but while the Court determined *314 that further evidence of abuse was unnecessary, it plainly believed it had existing evidence of abuse before it.[3]
And finally, the petition did not allege that the parents' mental conditions caused potential harm to the children.[4] Nor did the parents try the allegation by consent. We are cognizant that when evidence is presented beyond the pleading and the party does not object to it, the issues raised by it are deemed to be tried by consent. See In the Interest of J.M.S., 83 S.W.3d 76, 86 (Mo.App. W.D. 2002). However, the rule is not absolute as the dissent suggests. "[T]hat rule applies only where the evidence bears solely on an unpleaded issue and is admitted without objection." See In the Interest of S.M.H., 160 S.W.3d 355, 365-66 (Mo. banc 2005). Here, the evidence of the parents' mental conditions did not reflect solely on an unpleaded issue.[5] Their mental conditions were introduced as part of the parenting assessments, which were submitted by the Juvenile Officer to support its request for a continued out-of-home placement for the children, and to support the pleaded allegation of abuse by use of unreasonable discipline. Thus, the tried by consent rule is inapplicable.
The Juvenile Officer did not seek custody of the children based on an allegation that the parents' mental conditions cause potential harm to the children and the parents did not implicitly consent to adjudication of that allegation. The parents did not have the opportunity to demonstrate why their mental conditions and the circumstances at home do not cause potential harm to the children. Due process requires that they have an opportunity to defend against this allegation. See S.M.H., 160 S.W.3d at 366; J.M.S., 83 S.W.3d at 85.

Conclusion
In these circumstances, we conclude that the case must be remanded to the juvenile court for further proceedings, which may include further evidentiary hearings. We are required to reverse the judgment because the Juvenile Officer did not prove the pleaded allegation of abuse by clear and convincing evidence. It appears that the juvenile court was concerned with the parents' mental conditions and thus found the children were in need of care because of abuse. However, to find the children were abused or neglected absent substantial evidence to support it was improper and cannot be justified. Nor can the determination *315 that the children needed care due to a potentially dangerous environment be independently justified. Especially, here when the juvenile court had the authority to continue the hearing and order the parents to release the results of their psychological evaluations. See Rule 123.02(a)[6] ("Prior to adjudication and after hearing the court may order examination by a physician, surgeon, psychiatrist, or psychologist of a person whose ability to care for a juvenile who is before the court is in question.") The Juvenile Officer could have requested a subpoena duces tecum to obtain the psychological evaluations and the presence of the examining doctor. Cf. Bohrn v. Klick, 276 S.W.3d 863, 866 (Mo.App. W.D.2009) (stating section 210.140 prevents a party from invoking the physician-patient privilege in proceedings involving suspected child abuse or neglect).
Without this evidence of their mental conditions, the juvenile court improperly made a probable cause determination that the children were in a potentially dangerous environment and needed care. Probable cause[7] is the standard for protective custody and not adjudication. See Rule 111.13(a). However, the probable cause standard "is ill suited to the determination of whether an individual has abused or neglected a child," Jamison v. Mo. Dep't of Soc. Servs., 218 S.W.3d 399, 411 (Mo. banc 2007). Probable cause does not require balancing the evidence but assessing the evidence based on the fact finder's subjective values, which is prone to "erroneous fact finding." Id. In determining the abuse of child, that risk of error must be shared between the parties, which is accomplished by requiring a higher standard. See id.
Therefore, we reverse the juvenile court's judgment, and remand for further proceedings. On remand, the juvenile court must consider only the grounds in the petition or in any amended petition filed. See In the Interest of H.R.R., 945 S.W.2d 85, 89 (Mo.App. W.D.1997). Additionally, the juvenile court will issue amended findings that conform to the law.
Chief Judge THOMAS H. NEWTON writes for the majority.
Presiding Judge ALOK AHUJA concurs.
Judge HAROLD L. LOWENSTEIN writes a dissent.
HAROLD L. LOWENSTEIN, Judge, dissenting.
This dissent is filed with great reluctance. The majority is correct in that the evidence of physical abuse by both the C.G. ("Mother") and M.G. ("Husband") is tame in comparison with other cases in which this court has affirmed the taking of children from the parental home. Indeed, there were no distinct burns that required hospitalization, nor physical scars from spanking on these two children. No one piece of evidence in this record demands a continued loss of parental control. I believe, however, that this is one of those rare cases where a combination of factors makes reunification at this time an invitation to almost certain disaster.
The following testimony of two witnesses succinctly sums up the reason to affirm the trial court. A licensed clinical *316 social worker testified that because of Husband's Explosive Anger Disorder and Bipolar Disorder, there should "be a psychological evaluation prior to the children coming home." He also recommended that the Husband "be assessed to see if he heeded psychotropic medication to address those issues." The Henry County investigator said that three months had elapsed during which Mother and Husband were not following the agreed upon parenting plan. He concluded that the children's "safety to be returned to the home was just unsure." When asked on cross-examination, "What if they don't want you fixin' their problems?" he answered "Well, I have a duty to ensure the safety of the children."
Both parents suffer from emotional disorders and have not been compliant with the parenting plans. Husband and Mother agreed to undergo psychological testing and to release the results of the tests but, after testing, withdrew their consent based on federal HIPPA grounds, not because of any failure to be notified of the Juvenile Officer's intent to delay reunification based on Mother and Husband's mental disorders. The following evidence was produced by the Juvenile Officer. The evidence is viewed in a light most favorable to the judgment. In the Interest of A.A.R., 39 S.W.3d 847, 850 (Mo.App.2001).
Husband, who is thirty-one years of age, married Mother in 2005. He has derived his income from Social Security Disability Insurance payments for the past four years. He is unable to work because of "anger management" problems; specifically, he gets angry and hits fellow co-workers. His disorder manifests when he becomes angry, explodes, and cannot control physical or verbal aggressive impulses. While at the Children's Services office, Husband became verbally abusive with a caseworker, drawing the attention of a co-worker. Husband would only agree to psychological testing if the Children's Division caseworker was dismissed from the case. The caseworker was dismissed. The appellants then withdrew consent for the release of the test results.
Husband has been prescribed numerous medications to help him control his impulses but proudly proclaimed that he did not take, and had not taken for more than a year and a half, six prescribed anti-explosive anger disorder medications that he had been prescribed. Husband has a history of drug and alcohol abuse. He has been in and out of mental health facilities since 1989. Husband has fathered four children by four different mothers and has a criminal history of non-support and forgery. Husband was evasive when asked whether he gave the two female children baths and was concerned that people thought he had sexually abused the girls. Husband stated, further, that he would like to shoot his mother-in-law between the eyes.
Mother is also thirty-one years of age. Her children were previously removed from the home in 2005. Mother does not work outside the home; she explodes verbally when she is touched by others. Mother has been diagnosed as suffering from bipolar disorder and paranoia. Mother used methamphetamines and marijuana between the ages of fourteen and twenty-two.
Mother has been involved in several previous parenting plans that addressed the use of belts to punish the children. When Mother was asked about Husband using a belt to punish the children in 2008, she denied that he did so; but, when told that he had admitted using the belt, Mother changed her story. Psychological testing indicated that Mother had a "strong possibility of ... becoming physically abusive to *317 her children ... if this has not already occurred."
The oldest child, N.M.D.A., will soon be nine years old. She suffers from learning and speech disabilities and is emotionally disturbed. She told the Children's Division investigator that she would get into trouble for talking to "DFS." She exhibited fear when asked about the use of the belt to punish. Most disturbing, however, is that when she was told she would be going back home, she did not respond but lay on the school ground and, "continued in a fetal position, rocking back and forth, stating, `This is bad. This is very bad.'"
M.N.J. is only seven years old. She hears voices and takes medication for psychological disorders. Mother testified that this seven-year-old child refers to her maternal grandmother as a "whore," "slut," or "*unt." She did not want to go back home except to visit.
In light of the above evidence and, most specifically, the children's fear of going home, I believe the trial court, which saw the witnesses and can best judge credibility, reached the right result. See In the Interest of R.G., 885 S.W.2d 757, 763 (Mo. App.1994). If all the evidence mentioned above was beyond the Juvenile Officer's petition, then its admission without objection amounted to a trial by consent. In re S.L.N., 8 S.W.3d 916, 922 (Mo.App.2000) ("While it is true that due process requires that termination occur only on a ground asserted in the petition, the failure to object to evidence offered beyond the scope of the pleadings results in automatic amendment of the pleadings to conform to the evidence and is a consent to try the applicable issues.") (Internal citations and quotations omitted.)
The majority is sincere and well-intentioned in its efforts to protect the rights of Mother and Husband. The result, however, should not be reached by concluding: (a) that Mother's initial denial of using a belt to discipline may have reflected a guilty conscience; (b) by referring to the evidence of Husband's explosive anger disorder as being "alleged"; (c) by characterizing the mental conditions of Mother and Husband as "disconcerting"; nor (d) the ultimate conclusion they did not try the issue of Mother and Husband's mental conclusions by consent. Two particular evidentiary matters would seem to instantly tilt to a conclusion that these children were in a dangerous environment: (1) the older child curling up in a protective position and moaning when told she might be returning to the home; and (2) Mother and Father's change of decision to not divulge the ultimate test results.
I believe the evidence is clear and convincing that these children have been subjected to abuse and ill treatment, and that returning them to the parental home based on the uncontroverted evidence addressed at trial would put them in imminent danger. As stated in In the Interest of G.C., 50 S.W.3d 408, 411 (Mo.App.2001):
When faced with a potentially harmful situation, the juvenile court need not wait until harm is done before it can act. Rather, the court is authorized to act to prevent the deterioration of the children's situation. At the risk of being wrong, we are required to protect innocent children who cannot care for themselves.... [O]ur paramount concern is the welfare of the child, which supersedes our preference for parental custody."
(Internal citations omitted.)
I also believe it would be unfair to make the Juvenile Officer produce the same evidence (with or without the test results) would relegate the trial from which this appeal emanates, to nothing more than a glorified deposition.
*318 For foregoing reasons, I would affirm the judgment of the trial court.
NOTES
[1] DFS is the acronym for the Division of Family Services, which is currently known as the Children's Division.
[2] Statutory references are to RSMo 2000 and the Cumulative Supplement 2008.
[3] The quoted statement was preceded by the juvenile court "not[ing] ... that there has been a past history of alleged incidents of abuse upon these children." In response to the parent's challenge to this finding, however, the Juvenile Officer expressly acknowledges, "it was not the substantive basis for the Court's finding of jurisdiction."
[4] We recognize that such an allegation supported by clear and convincing evidence of the parents' mental conditions and the projected harm to the children, could support the exercise of jurisdiction under section 211.031. See In the Interest of J.J., 718 S.W.2d 235, 237 (Mo.App. E.D.1986) (affirming the assertion of jurisdiction over infant based on allegation and supporting expert testimony that parents' mental conditions caused a potentially harmful environment to infant); see also L. v. Jackson County Juvenile Court, 544 S.W.2d 330, 333 (Mo.App. 1976) (When a juvenile court asserts jurisdiction based on potential harm to the child, the proof of the projected harm should be by qualified experts and not a mere conclusion).
[5] There is evidence that Mother objected to the admission of both parenting assessments, but on the grounds that it violated their right to privacy under HIPPA because the parents' withdrew their consent to release the information to the Children's Division, and the Children's Division was not entitled to the information.
[6] Rule references are to Missouri Rules of Civil Procedure 2008.
[7] "Probable cause exists when the available facts would cause a reasonable person to believe a child was abused or neglected when viewed in the light of the surrounding circumstances." Jamison v. Mo., Dep't of Soc. Servs., 218 S.W.3d 399, 411 (Mo. banc 2007) (internal quotation marks and citation omitted).