327 S.W.3d 533 (2010)
In the Interest of: N.J.B., Minor
W.N.W., Natural Mother, Appellant,
v.
Greene County Juvenile Office, Respondent.
No. SD 30480.
Missouri Court of Appeals, Southern District, Division One.
October 27, 2010.
*534 M. Elise Branyan Barker, Springfield, MO, for Appellant.
Bill Prince, Springfield, MO, for Respondent.
DON E. BURRELL, Judge.
On January 14, 2010, N.J.B. ("Juvenile"), the twelve-year-old son of W.N.W. ("Mother"), was taken into protective custody by a deputy juvenile officer ("DJO"). The next day, the DJO filed a petition in the Juvenile Division of the Circuit Court of Greene County ("Juvenile Division"), alleging that
[Mother] is unwilling and/or unable to provide the level of supervision that the juvenile requires. [Juvenile]'s eight-year-old sibling disclosed that [Juvenile] licked the sibling's vagina, anus, and chest. The sibling had to be hospitalized for suicidal ideations resulting from the sexual contact. A delinquency petition has been filed against [Juvenile].[[1]]
*535 After Mother filed a motion for more definite statement, the DJO filed an amended petition that alleged the sexual contact between Juvenile and his sibling ("Sister") occurred on or between December 18-22, 2009, and added the claim that "[Mother] does not believe [Sister][,] thereby placing her at risk of further abuse."
Following an evidentiary hearing, the Juvenile Division entered an "order and judgment" that found the allegations of the amended petition "with the exception of the allegation that [Sister] threatened to kill herself due to the abuse, filed by the Juvenile Office are true and that [Juvenile] comes and/or continues to come within the provisions of § 211.031.1(1)RSMo."[2] The Juvenile Division further found that "[r]emoval of [Juvenile] from [Juvenile]'s home was necessary to protect [Juvenile] and further efforts could not have prevented or shortened the separation of the family because: [c]oncerns regarding willingness of [M]other to believe [Sister's] sexual abuse allegations."
Mother now timely appeals the Juvenile Division's order taking "jurisdiction" over Juvenile, asserting it was not supported by substantial evidence.

Facts
The facts, and the reasonable inferences from the facts, are viewed in the light most favorable to the decision of the trial court. In re M.R.F., 907 S.W.2d 787, 789 (Mo. App. S.D.1995). An investigator for the Children's Division, Dana Kluesner, testified that on December 21, 2009, she investigated a hotline report that alleged one sibling had perpetrated abuse against another sibling at Mother's home. Another investigator, Renae Wehmeier, testified that at some point Sister told Mother that Juvenile "licked her boobs and her butt." Kluesner went to Mother's home and implemented a safety plan that temporarily placed Sister and another sibling in a safe house away from Juvenile until the Children's Division investigation could be completed. Mother was emotional upon hearing the nature of the investigation and indicated to Kluesner that she did not believe Juvenile had abused Sister. Nonetheless, Mother cooperated and permitted Kluesner to speak with the children individually.
Juvenile first told Kluesner that Sister made him do it. Juvenile later stated that he did not do it and Sister was lying. He further stated that the only time he had touched Sister was when they had previously lived with their father ("Father"). Sister told Kluesner that [Juvenile] had touched her after he came home from Boys and Girls Town. Juvenile had been in residential treatment at Boys and Girls Town for approximately six months for "defiance or problems with following rules."
Before closing her investigation at the end of December, Kluesner drafted a second safety plan that was intended to allow Juvenile to again reside with Sister and his other sibling in Mother's home. That safety plan "just stated when they're home, [Mother] is to keep them at least supervised *536 and to keep them separated especially at bedtime they're not to be in the same room." When Kluesner recommended that Mother put alarms on the door, Mother told Kluesner "she didn't have doors on the bedrooms at that time because of some prior hotlines, I guess. She had informed me [of] some problems that she had so she decided just to take the doors off of the bedrooms." It does not appear that this second safety plan was ever implemented as the investigation continued and Juvenile did not actually return to Mother's home.
The investigation was continued by Wehmeier when the Children's Division received a second hotline report involving the same incident. The first hotline report had apparently focused on whether Juvenile had abused Sister, while the second focused on whether Mother had failed to provide adequate supervision by permitting the abuse to occur. Mother voluntarily placed Juvenile in the home of a nurse who worked at Boys and Girls Town ("Nurse"). The DJO then placed Juvenile into protective custody when Nurse could no longer care for Juvenile in her home and "there were concerns about [Mother] believing that anything had occurred[.]" Father was out of state and was subject to a court order that prohibited his having any contact with the children.
Wehmeier met with Mother on January 6, 2010, and Mother told Wehmeier that she was not sure if the incident actually happened because she wondered if Sister was confusing nightmares with reality. Mother again cooperated with the Children's Division investigator, providing her with information about the children's counselors and doctors. Wehmeier felt that Sister needed additional help with issues she faced and that it would be difficult for her to make progress with Juvenile in the home.
Sister was interviewed at the Child Advocacy Center in Springfield by forensic interviewer Kim Lowery-Grimm. A video recording of the interview was admitted into evidence at the hearing. Mother did not include that exhibit in the record on appeal. As a result, we will infer that it would not be favorable to her and instead supports the ruling of trial court. Shadow Lake of Noel, Inc. v. Supervisor of Liquor Control, 893 S.W.2d 835, 839 (Mo.App. S.D.1995). The trial court stated that the videotaped interview demonstrated
that [Sister] had fairly good recall, not only as to what she claims [Juvenile] did, but also such things as quoting which is something that [sic] teach us to look for in these interviews. Children who make up things oftentimes aren't able to specify specific clothing, things such as that.
Based on that, I do find that there is sufficient evidence to want [sic] the Court taking jurisdiction in this matter over [Juvenile] except I do not find in my review of the hospital reports  and certainly [name of the attorney for the DJO] if something in there might be [sic] to point it out to me, but I do not see anything to support the allegation that [Sister] was hospitalized  she was hospitalized for suicidal ideations, but I don't have anything before me that it was a[sic] resulting from the sexual contact.
Sister's records from Burrell Behavioral Health and Lakeland Hospital were also admitted into evidence, and the trial court took judicial notice of other court files involving the family.[3] A psychological report on Sister prepared by "Dr. Bradford" *537 was offered by Mother's counsel and received into evidence without objection.
Mother presented the testimony of a therapist, Joe Martin, who worked with Juvenile at Boys and Girls Town when Juvenile resided there. Martin testified that he never saw Juvenile act out sexually or say sexual things. Martin did not feel that Juvenile would present a danger to anyone when he was transitioned home in June 2009. He thought Mother was consistent with the other children and "was really doing well with [Juvenile]."
A family counselor, Dr. Robert Gladden, testified that he worked with Mother and her children in 2008 and up to September 2009. He never saw Juvenile say or do anything of a sexual nature to Sister. While he questioned Sister's veracity in some respects, he believed that Father had done horrible things to the children and was concerned that Father had made Juvenile do inappropriate things to Sister. Dr. Gladden testified that Mother would probably be able to manage the children and protect them from each other.

Analysis
In cases involving the abuse or neglect of children, the standard of appellate review is the same as that applied in other court-tried civil cases. In re L.W., 830 S.W.2d 885, 886 (Mo.App. S.D.1992). The judgment must be sustained unless it lacks substantial evidence, is against the weight of the evidence, erroneously declares the law, or erroneously applies the law. Id. The allegations must be established to the trial court by clear and convincing evidence. In re D.K.S., 106 S.W.3d 616, 619 n. 1 (Mo.App. W.D.2003). "Evidence is clear, cogent and convincing when it instantly tilts the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." In re A.M.C., 983 S.W.2d 635, 637 (Mo.App. S.D.1999).
"The reviewing court defers to the trial court on issues of fact and the credibility of witnesses." In re T.B., 936 S.W.2d 913, 914 (Mo.App. W.D.1997). "In our review, we are mindful that the [juvenile division] was in a superior position to judge the credibility of the witnesses and that it was free to believe all, part, or none of the witnesses' testimony." In re B.C.K., 103 S.W.3d 319, 322 (Mo.App. S.D.2003). Conflicting evidence is viewed in the light most favorable to the trial court's determination. In re C.F.C., 156 S.W.3d 422, 426 (Mo.App. E.D.2005).
Mother's point relied on states:
The trial court erred to the prejudice of [Mother] when it determined that the allegations contained in the first amended petition were true and that [Juvenile] came within the provisions of section 211.031.1(1) in that there was insufficient evidence for the court to find that the evidence presented clearly, cogently, and convincingly demonstrated that [Mother] was unwilling or unable to provide the level of supervision that [Juvenile] requires or had otherwise neglected or refused to provide the child with the proper support, education, medical, surgical or other care necessary for his well-being, or that the minor child was without proper care, custody or support and control in that testimony clearly indicated that [Mother] had continued to access mental health services even after the juvenile case was closed, had cooperated fully with the Children's Division investigation, had met with juvenile officers and had followed safety plans as set forth by the Children's Division and [Juvenile Division].
The trial court's determination was that the DJO presented sufficient evidence *538 to allow the Juvenile Division to assume "jurisdiction" of Juvenile pursuant to section 211.031.1(1). The pertinent portion of that statute provides:
1. Except as otherwise provided in this chapter, the juvenile court or the family court in circuits that have a family court as provided in sections 487.010 to 487.190, RSMo, shall have exclusive original jurisdiction in proceedings:
(1) Involving any child or person seventeen years of age who may be a resident of or found within the county and who is alleged to be in need of care and treatment because:
(a) The parents, or other persons legally responsible for the care and support of the child or person seventeen years of age, neglect or refuse to provide proper support, education which is required by law, medical, surgical or other care necessary for his or her well-being; except that reliance by a parent, guardian or custodian upon remedial treatment other than medical or surgical treatment for a child or person seventeen years of age shall not be construed as neglect when the treatment is recognized or permitted pursuant to the laws of this state;
(b) The child or person seventeen years of age is otherwise without proper care, custody or support; or
. . . .
(d) The child or person seventeen years of age is a child in need of mental health services and the parent, guardian or custodian is unable to afford or access appropriate mental health treatment or care for the child[.]
Section 211.031.1(1). The trial court's order does not specify which subsection(s) of section 211.031.1(1) was/were applicable in this case, and Mother does not specifically appeal the order on the grounds that it failed to do so. She also has not alleged that she received inadequate notice of the statutory grounds being asserted by the DJO or that the allegations in the petition were insufficient to warrant a hearing.[4] Instead, Mother alleges, presumably in reference to the neglect provisions set forth in section 211.031.1(1)(a), that there was insufficient proof that she "was unwilling or unable to provide the level of supervision that [Juvenile] requires or had otherwise neglected or refused to provide [Juvenile] with the proper support," and, presumably in reference to section 211.031.1(1)(b), that there was insufficient proof "that [Juvenile] was without proper care, custody, or support and control[.]" Mother's evidentiary challenge focuses on two areas: 1) Sister's credibility and the evidence contrary to her account; and 2) Mother's cooperation with the Children's Division and compliance with its safety plans.
Credibility determinations are the province of the trial court, which found that Sister "had fairly good recall, not only as to what she claims [Juvenile] did, but also such things as quoting which is something that [sic] teach us to look for in these interviews." The trial court found that Sister "was not making it up." We defer to those credibility assessments. In re T.B., 936 S.W.2d at 914. In assessing the sufficiency of the evidence to support the trial court's assumption of "jurisdiction" over Juvenile, we do not disturb its determination that the sexual contact incident described by Sister did in fact occur.[5]See In re C.F.C., 156 S.W.3d at 426.
*539 As to Mother's cooperation with the Children's Division and Juvenile Division, Mother points out that "[a]lthough [Mother] may have expressed disbelief at the allegations of inappropriate touching by [Juvenile], there is nothing in the record that indicates that she failed to take measures to protect [Sister] upon learning of the allegations or took adverse action against [Sister] for making the allegations." Respondent argues that Mother's "refusal [to believe Sister] placed both [Juvenile] and the victim in the position for future abuse and the criminal consequences thereof for committing that abuse[ ]" and that this constituted neglect under Section 211.031.1.[6] Sufficient evidence supported the trial court's conclusion that Mother doubted whether Juvenile sexually touched Sister. Neither party presents case law addressing whether a parent's doubt that sexual abuse has occurred constitutes neglect, per se, and we make no such holding here as Mother's disbelief is not the only fact supporting the trial court's neglect finding.
Respondent relies on the definition of "neglect" set forth in section 210.110(12)  the "failure to provide, by those responsible for the care, custody, and control of the child, the proper or necessary support, education as required by law, nutrition or medical, surgical, or any other care necessary for the child's well-being[.]" Respondent also cites the definition of neglect applied in In re C___F___B, 497 S.W.2d 831, 837 (Mo.App.K.C.D.1973)  "a failure by the parents to supply the minimum quality of care which the community will tolerate."
The DJO's amended petition alleged Mother was "unwilling and/or unable to provide the level of supervision that [Juvenile] requires. [Juvenile]'s eight-year-old sibling disclosed that on or between December 18, 2009[,] and December 22, 2009, [Juvenile] licked the sibling's vagina, anus, and chest. . . ." The trial court found that these allegations were true and that "[s]afety in [the] home cannot be assured." The DJO did not allege that Mother refused to cooperate with Children's Division, and both investigators testified that Mother was generally cooperative and was candid about the limitations of her home. While cooperation with Children's Division is a good thing, a parent's inability to provide the necessary care and support demanded by a particular situation may constitute neglect even if that inability is unintended.
In the context of an action to terminate parental rights, the Western District addressed an instance of "unintended" neglect as follows:
Most basically, intent and neglect are mutually exclusive, in that intent refers to a willful act, while "[n]eglect has been described in the context of a termination of parental rights proceeding as `a general and a negative proposition meaning simply the failure to perform the duty *540 with which a parent is charged by the law and by conscience.'" In re S.L.N., 8 S.W.3d 916, 928 n. 5 (Mo.App. S.D. 2000), quoting, In Interest of S.K.L., 480 S.W.2d 119, 124 (Mo.App.1972) (emphasis added). As one does not intend neglect, the fact that Mother may not have intended to neglect her children cannot preclude a finding that she did neglect them and did allow conditions to develop through neglect that could lead to abuse. No doubt for this reason, the issues in a termination proceeding under [s]ection 211.447.4(3) for continuation of conditions of neglect do not primarily involve the parent's intent, but rather whether the conditions that led to the assumption of jurisdiction still exist or whether conditions of a potentially harmful nature continue to exist. In other words, it is the continued existence of an unremedied, neglectful situation that is the ultimate issue.
In re J.K., 38 S.W.3d 495, 500 (Mo.App. W.D.2001).
The evidence regarding a lack of bedroom doors demonstrated that Mother's home was not equipped to effectively keep her children from having unsupervised contact with one another while mother was asleep. Mother's limited ability to otherwise control Juvenile was demonstrated by his recent return from a residential facility for "defiance or problems with following rules." Despite Mother's efforts and her cooperation with Children's Division, Juvenile's voluntary placement with Nurse was unable to continue. The trial court concluded that Mother's own witness, Dr. Bradford, recommended that, at a minimum, the children be separated for a long period of time. The trial court agreed with Respondent's counsel's statement, based on Dr. Bradford's report, that Sister needed "an extraordinary amount of attention to prevent sexual play or events from happening." While Wehmeier expressed concern that Mother doubted whether the sexual touching had occurred, a more basic concern was that Mother would have been unable to prevent Juvenile from having access to Sister even if Mother had been absolutely convinced that such a separation was necessary.
Although Mother correctly asserts that she accessed available mental health services and cooperated with the Children's Division by following its safety plans, substantial evidence supported the trial court's determination that: 1) Juvenile sexually touched his younger sister; and 2) Mother could not (at the time of the evidentiary hearing) properly provide Juvenile with the necessary care and support.[7]
Mother's point is denied, and the trial court's March 2, 2010, order is affirmed.[8]
BARNEY, P.J. and LYNCH, J., Concur.
NOTES
[1] The petition also alleged that Juvenile's father was not a suitable custodian for the child. Juvenile's father is not a party to this appeal. At the time of the evidentiary hearing, Juvenile's father resided in Indiana, and allegations had surfaced that he had sexually abused the children.
[2] All statutory references are to RSMo Cum. Supp.2006. A determination that a particular juvenile's circumstances meet the criteria set forth in section 211.031.1 has commonly been referred to as a finding that the juvenile is within the "jurisdiction" of the juvenile division of the circuit court. Our placement of the term "jurisdiction" within quotation marks in this opinion is used as a means of indicating that the term is being used in this customary manner and not in reference to either subject-matter or personal jurisdiction.
[3] These court files were also not included in the record on appeal. As with the video recording, we likewise assume that the contents of these files would support the trial court's order.
[4] The trial court's order found that the allegations stated in the amended petition, with one exception, were true, but made no specific references to any subsections of Section 211.031.1(1). Likewise, the DJO's amended petition relied on the general provision of section 211.031.1 and did not refer to any particular subsections of section 211.031.1(1).
[5] After the trial court announced it was taking "jurisdiction" over Juvenile, Respondent's counsel stated,

You know, this is a hard case, Judge, in terms of the disposition in this case. . . . I'm beginning to wonder if we  we got the right kid in care. I mean, I'm a little concerned about [Sister]. You know, because all I've heard is that she's, you know, inferentially she's  she can't tell the truth. She can't differentiate, you know, fiction from reality and we're worried about her. But again, this case is about [Juvenile]. So that's  that's kind of where we're at.
Counsel's opinion as to Sister's veracity was not binding on the trial court, which did not reconsider its announced decision after this statement by Respondent's counsel was made.
[6] In cases involving the abuse of one child by another, when both children reside in the home, a failure to support or properly care could presumably apply to both the victim and the perpetrator of the abuse.
[7] We should also point out that if Sister's allegations had been false, proper care for Juvenile would include an ability by Mother to keep Juvenile and Sister separated in order to prevent any additional false accusations by Sister that could subject Juvenile to additional delinquency charges.
[8] The dispositional provisions of the trial court's order have not been challenged on appeal.