In the Interest of B.T.C., E.L.C., R.A.C., and A.B.C., children under seventeen years of age.

Greene County Juvenile Office, Petitioner–Respondent,

v.

K.J.C., Respondent–Appellant.

Nos. SD 31601, SD 31602, SD 31603, SD 31604.

Missouri Court of Appeals, Southern District, Division One.

Sept. 11, 2012.

Application for Transfer Denied Nov. 20, 2012.

M. Elise Branyan Barker, for Appellant.

Brittany O'Brien, for Respondent.

Douglas Andrew Hosmer, for Minor Children.

NANCY STEFFEN RAHMEYER, J.

Removal of a child from a parent's custody implicates the fundamental right of parents to rear their children free from government interference. A parent's right to rear her child is a fundamental liberty interest protected by the Constitution's guarantee of due process. A parent's liberty interest in the care, custody, and control of her

child is perhaps the oldest of the fundamental liberty interests recognized by the U.S. Supreme Court. This interest does not evaporate simply because a parent has not been a model parent, or even because she has lost temporary custody of her child to the State.

*In re J.M.*, 328 S.W.3d 466, 470 (Mo.App. E.D.2010) (internal citations omitted).

The minor children were taken into protective custody by a deputy juvenile officer on April 28, 2011. The petition filed pursuant to section 211.031.1[1] stated:

A. [M]other has made repeated allegations that the father is sexually and physically abusing the minor [children]. Two [Child Advocacy Center, "CAC"] interviews have been done of all of the children and no disclosures have been made. Multiple interviews have been done of the children by Children's Division workers and law enforcement and there has been no evidence to prove the allegations. [B.T.C.] reported that his mother takes pictures of his penis and the siblings disclosed the mother told them what to say for the interviews.

B. [Mother] removed [B.T.C.] from school and moved him and his siblings to a shelter in Polk County due to her concerns of the Father's reaction to the allegations. She then moved the children to Isabel's House.[2] The children have been told not to tell their father where they are living and that they are staying in a "safe house". The children have been repeatedly removed from school and daycare to be taken to doctor's appointments and interviews.

C. The parents have been going through a divorce since 2009, since they separated there have been ten reports to Children's Division with allegations of abuse by the father. Prior to separation there were not any reports.

D. The father has taken no action to remove the children from their mother's care. The father is either unwilling or unable to protect the children.

At the time that custody was taken, B.T.C. was six years old, E.L.C. was five years old, and R.A.C. and A.B.C. were three years old. All four children lived primarily with K.J.C. ("Mother") and had parenting time with H.O.C. ("Father"), according to a court ordered parenting plan.

At the adjudication hearing on June 23, 2011, the court found that the children were "in need of the care, protection and services of the Court"; it then immediately entered orders and judgments taking "jurisdiction"[3] of the children after finding "clear, cogent, and convincing evidence that the allegations contained [in] the Petition[s] filed by the Juvenile Office are true and that the juvenile[s] come[ ] and/or continue[ ] to come within the provisions of section 211.031.1(1) RSMo." The court provided no further findings. At that time, the orders and judgments noted that, "[j]urisdiction is taken disposition continued so the Court can review all evidence[.]" Subsequently, the court entered

1. All references to statutes are to RSMo Cum. Supp.2005, unless otherwise specified.

2. Isabel's House is a facility which provides 24/7 residential care for children 12 years of age and under when the family is in crisis.

3. A determination that a particular juvenile's circumstances meet the criteria set forth in section 211.031.1 has commonly been referred to as a finding that the juvenile is within the "jurisdiction" of the juvenile division of the circuit court. Our placement of the term "jurisdiction" within quotation marks in this opinion is used as a means of indicating that the term is being used in this customary manner and not in reference to either subject-matter or personal jurisdiction.

*In re N.J.B.*, 327 S.W.3d 533, 535 (Mo.App. S.D.2010).

revised orders and judgments on June 28, 2011. Again, the court found that the minor children "come[ ] and/or continue[ ] to come within the provisions of § 211.031.1(1) RSMo" and that:

> [r]emoval of the juvenile[s] from the juvenile[s'] home was necessary to protect the juvenile[s] and further efforts could not have prevented or shortened the separation of the family because: Mother *emotionally abus[ed]* the children, father had no legal ability to protect the children and had not taken steps to do so prior the children coming into care.

(emphasis added). The court further found that services offered to Mother did not enable the return of the juveniles to her home and "return to the home would be contrary to the welfare of the minor child[ren] because: Mother denies that she has had any inappropriate behavior, [and the] safety of the children could not be assured in her care."

On appeal, Mother claims the trial court erred in finding that it has "jurisdiction" over the children, pursuant to section 211.031.1(1).[4] We agree and reverse the finding that it was proper for the juvenile court to take "jurisdiction" of the minor children and the judgments removing the juveniles from Mother's home.

▆▆▆ "Our standard of review for decisions in juvenile proceedings is the same as for any court-tried civil case." *In re T.B.L.T.*, 367 S.W.3d 663, 664 (Mo.App. E.D.2012). Therefore, as in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976),

this Court will affirm the trial court's judgment unless there is no substantial evidence to support it, the decision is against the weight of the evidence, or it erroneously declares or applies the law. *Id.* at 665. "The facts, and the reasonable inferences from the facts, are viewed in the light most favorable to the decision of the trial court." *In re N.J.B.*, 327 S.W.3d at 535.

▆▆▆ Section 211.031 provides, in part: [T]he juvenile court or the family court ... shall have exclusive original jurisdiction in proceedings:

(1) Involving any child or person seventeen years of age who may be a resident of or found within the county and who is alleged to be in need of care and treatment because:

(a) The parents, or other persons legally responsible for the care and support of the child or person seventeen years of age, neglect or refuse to provide proper support, education which is required by law, medical, surgical or other care necessary for his or her well-being; [or]

(b) The child or person seventeen years of age is otherwise without proper care, custody or support[.]

Section 211.031.1. "To assert jurisdiction, the lower court must find clear and convincing evidence that the child needs care because the parent has neglected to provide the care necessary for the child's well-being." *In re T.B.L.T.*, 367 S.W.3d at 665. " 'Evidence is clear, cogent and convincing when it instantly tilts the scales in the

---

4. In the notices of appeal, Mother noted that she is appealing from the judgments of July 12, 2011; however, those judgments are entitled "Findings & Recommendations/Order & Judgment Following: Dispositional Review" and were entered by the juvenile court following the *dispositional* hearing on July 12, 2011. As Mother's point on appeal makes it clear that she is challenging the finding from the *adjudication* hearing that the minor children

came under the "jurisdiction" of the Juvenile Court, we assume that Mother is actually appealing from the revised judgments of June 28, 2011, entered by the court. This is further evidenced by the fact that the appendix to Mother's brief includes the judgments of June 23rd and 28th. Mother was granted leave by this Court to file late notice of appeals in all four consolidated matters.

affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true.'" *In re N.J.B.*, 327 S.W.3d at 537 (quoting *In re A.M.C.*, 983 S.W.2d 635, 637 (Mo.App. S.D.1999)). "The clear, cogent and convincing standard is more stringent than that of 'preponderance of the evidence.'" *In re A.M.C.*, 983 S.W.2d at 637(quoting *Estate of Cates*, 973 S.W.2d 909, 915 (Mo.App. W.D.1998)); *see also Osborn v. Boatmen's Nat'l Bank of St. Louis*, 811 S.W.2d 431, 435 (Mo.App. E.D. 1991).

Because Mother is challenging whether substantial evidence supports the granting of the judgments based on the filed Petitions, for ease of discussion we shall take each of the allegations in the order given in the Petitions.

## A. [1] THE MOTHER HAS MADE REPEATED ALLEGATIONS THAT THE FATHER IS SEXUALLY AND PHYSICALLY ABUSING THE [MINOR CHILDREN].

The Petitions claim that "mother made repeated allegations." The Investigative Court Summary ("ICS") prepared by the Division of Children's Services ("Children's Services") and the testimony at trial indicated that nine[5] reports have been made with Children's Services since Mother and Father separated.

**August 3, 2009:** Two hotlines are listed on the ICS on this date, both involving allegations of an incident at B.T.C.'s daycare, including that B.T.C. had been the victim of sexual abuse by another child while he was at the Developmental Center of the Ozarks and that B.T.C. was neglected by a teacher at the Developmental Center of the Ozarks when the teacher did not properly supervise him. The inference at trial was that the hotlines were made by a mandated reporter. It is not clear if there was a disposition on the first hotline; however, the allegation of neglect due to lack of supervision was determined to be unsubstantiated.

**January 20, 2010:** A mandated report referral[6] was received alleging domestic violence by Father, who was supposedly not taking his medication and was verbally abusive to Mother. The call was made by a mandated reporter, not by Mother, and the family refused services. There is no dispute in the record that the allegation was true. Father admitted to not taking his medication and the verbal confrontation occurred in front of a church member.

**January 27, 2010:** A mandated report referral was received regarding behavioral issues with B.T.C. at school. Again, it was made by a mandated reporter,[7] not by Mother, and services were refused.

---

5. There is some confusion about whether or not the reports on certain dates constitute one or two hotlines. The ICS lists two separate report numbers on the same date; however, a Children's Services worker, Ms. Chism, testified that she "would assume that they were different because they have different numbers, but it's possible we had more than one report on the same incident." The ICS references seven reports and another Children's Services worker initially testified there were nine reports and then clarified that only seven reports were documented.

6. It was coded a "referral," which is not directly abuse or neglect to the children and not coded as an investigation. Also, on a referral, there is no determination of substantiated or unsubstantiated, the report is simply closed. Likewise, with an assessment, Children's Services determines whether or not the family is in need of any preventative services and no findings are made. The hotline unit who takes the calls determines whether a call is coded as a referral, an assessment, or an investigation.

7. There was testimony from Ms. Tynes, a counselor who consults with Head Start and

*February 4, 2010:* A family assessment was received after Mother had gone to the school and reported that Father had a carload of guns, including an AK–47, that he had threatened Mother and the children, and that he was off his medication. It was unclear who made this report. It was closed as "Family Assessment no services needed[.]"

*June 28, 2010:* A family assessment was received alleging that B.T.C. had a bruise on his back the size of a quarter and that Father had beaten him. It is unclear who made the call. It is unknown if services were offered or given.

*September 6, 2010:* An investigation was received due to A.B.C. having burns from the top of her bottom to her labia. It is unclear who made the call, but A.B.C. was taken to the hospital and someone there would have been required to call as a mandated reporter. The evidence at trial disclosed that A.B.C., at age three, suffered serious burns on her bottom while visiting at Father's home. The investigation by Children's Services "determined they were Ex–Lax. It was from Ex–Lax toxicity. She had gotten into some Ex–Lax while on a visit with her dad and eaten too many." Children's Services determined that the claim of abuse was unsubstantiated. Mother described the burns as "on one side of her butt cheek, bottom, tush and one labia. And she had skin hanging off and it was blistered and oozing and open." Father admitted he had not advised Mother of what happened nor did he take the child for medical care. Mother took the child to the emergency room. She claims the diagnosis was "abuse, chemical burn."

Mother testified that five days later Father told Mother that he had talked to the investigators, that he had to tell the truth, and that "she had drank a bottle of Ex–Lax or overdosed on Ex–Lax and that it was a burn caused from the diarrhea." Father testified that it was a "horrible accident" and he took appropriate steps to care for A.B.C. He said it was diarrhea that had given her the rash and decided not to give "full disclosure" because he was concerned about Mother's reaction. He said he discovered through his sister, a registered nurse, that it was actually a chemical in the chocolate Ex–Lax tablet [8] that A.B.C. ate which caused a chemical burn. He treated it with a prescription that his mother had for a prior burn. He changed the dressing frequently and, looking back, realizes he should have taken A.B.C. to emergency room. There was no evidence as to the explanation as to how long the child was unsupervised so that she could eat a box of Ex–Lax, nor did Children's Services consider that lack of supervision as neglect. *Contra In re M.N.J.*, 291 S.W.3d 306, 308–09 (Mo.App. W.D.2009) (where Children's Services took custody after a child's burn on her hand was treated with a medicated cream and not medical care, and children expressed fear of spanking if they returned home).

*April 20, 2011:* An investigation was received regarding sexual abuse of E.L.C. by Father. It is undisputed that Diana Hassani, a licensed professional counselor, who had been treating E.L.C. for approximately one year for counseling because of her parent's divorce, decided she must, as a mandated reporter, make a hotline call when five-year-old E.L.C. disclosed to her

---

who had been seeing B.T.C. after referral from Head Start, that the school "hotlined a couple of times," regarding B.T.C., as "the staff was very worried about his continued behavior in class."

8. It is not clear if the Ex–Lax was in tablet or liquid form.

that she had difficulty peeing, that it hurt, and that her dad had touched her bottom with his finger. Ms. Hassani further testified that E.L.C. told her she was afraid of her father, that her father "looked in windows and he didn't give her privacy, and she had trouble going to the bathroom when she was with him." Ms. Hassani further stated that E.L.C. told her when she was with her dad, "it made her stomach feel squeezy and hot and she got tingly, and she was afraid of being with him at the house that they lived in in Greenfield because she said that she got hurt." Ms. Hassani also noted that E.L.C. had stomach aches on her way to her dad's for visitation but not on the way home. Initially, Ms. Hassani thought it was simply carsickness because the roads were hilly and curvy and made recommendations concerning that, but, with the later statements, she became concerned that something else was going on. The child had been in therapy for a year and made these disclosures over time with her therapist. Clearly, Ms. Hassani was justified and obligated to make the hotline call as a mandated reporter. Section 210.115 [9]; *see also State v. Brown*, 140 S.W.3d 51, 52–53 (Mo. banc 2004) (where a nurse was charged for failure to report dime to quarter-sized bruises along the spine and a red bruise under the eye of a child already in the foster care system).

Ms. Hassani made her determination based on what the child told her in therapy. For instance, when the child was designing the playscape of her father's house, she would design it in a way that always surrounded him with dinosaur, Chromia,[10] dragons, and a perimeter fence with logs guarding a black stallion on his hind legs. The child always found the twin baby dolls and put them in safety as her first order of business.

An investigative worker for Children's Services, Ms. Escudero, interviewed the children at their home following the hotline. She spoke with E.L.C. and asked her what she had talked to her counselor about. E.L.C. pointed to her bottom, "the—not her vagina, but her anal area and again stated that her dad had touched her bottom and that he had a glove on and—on his hand." She also stated it hurt to pee. After listening to these statements, Ms. Escudero informed Mother that "neither child had made a disclosure of sexual abuse at that time." [11]

9. Section 210.115 states in part:
   1. When any physician, medical examiner, coroner, dentist, chiropractor, optometrist, podiatrist, resident, intern, nurse, hospital or clinic personnel that are engaged in the examination, care, treatment or research of persons, and any other health practitioner, psychologist, mental health professional, social worker, ... or other person with responsibility for the care of children has reasonable cause to suspect that a child has been or may be subjected to abuse or neglect or observes a child being subjected to conditions or circumstances which would reasonably result in abuse or neglect, that person shall immediately report or cause a report to be made to the division in accordance with the provisions of sections 210.109 to 210.183. As used in this section, the term "abuse" is not limited to abuse inflicted by a person responsible for the child's care, custody and control as specified in section 210.110, but shall also include abuse inflicted by any other person.

10. Chromia is the name used by several fictional figures in the Transformers series.

11. Sexual abuse to a female child can occur in areas other than the vagina. "Deviate sexual intercourse" is defined by statute as:
   any act involving the genitals of one person and the hand, mouth, tongue, or anus of another person or a sexual act involving the penetration, however slight, of the male or female sex organ or the anus by a finger, instrument or object done for the purpose of arousing or gratifying the sexual desire of any person or for the purpose of terrorizing the victim[.]

After the investigation by Children's Services, Mother packed the children's suitcases and stated she was going to a shelter as she thought Father would react badly to the report as Father had allegedly told B.T.C. that he would kill Mother. There is no indication in the record whether Father had indeed made remarks of that nature to B.T.C. Interestingly, the question was asked of Ms. Escudero whether she was concerned about the children remaining with Mother after the investigation. She replied that at that time she "didn't have enough information regarding the mother to have concern." She never discussed the complaints with Father and did not attend the CAC interviews; she also claimed Mother was defensive when she talked with her, "saying that DFS wasn't doing their job and wasn't protecting" the kids.

Another Children's Services worker, Ms. Chism, first had contact with the family when she covered the CAC interviews for Ms. Escudero on April 21st. Based on the "lack of disclosures" by the children at the CAC interviews, Ms. Chism did not have any concerns about the children visiting Father even though she had not yet spoken with him.

*April 21, 2011:* During the ongoing investigation of April 20, 2011, a second investigation was received partly because of an ex parte that Mother filed regarding Mother and the children. The report discussed several allegations, including: sexual abuse of E.L.C., the prior report regarding burns to A.B.C., Father threw a dresser drawer at B.T.C., and Father threatened to kill Mother. Ms. Escudero contacted the guardian ad litem ("GAL") assigned to the children in the divorce case and the two exchanged concerns. She also interviewed the children at Isabel's House.

Ms. Chism was reassigned to both the April 20, 2011 investigation and the new investigation of April 21, 2011;[12] however, her first contact with the family after the CAC interviews of April 21st was not until April 25, 2011. She spoke to the GAL before she did her own investigation regarding the latter hotline. She did not feel any of the allegations in the April 21st report were "new" and testified that there was no reason to follow up with the allegations after Ms. Escudero interviewed the children at Isabel's House. Father did throw a dresser drawer with B.T.C. present in the room but Ms. Chism determined that was not abuse because "nobody said anything about [B.T.C.] being hit with [it]." Ms. Chism testified that following conversations with the GAL and review of documents received from Isabel's House

Section 566.010.1(1), RSMo Cum.Supp.2006. "Sexual contact" is defined as, "any touching of another person with the genitals or any touching of the genitals or anus of another person, or the breast of a female person, or such touching through the clothing, for the purpose of arousing or gratifying sexual desire of any person[.]" Section 566.010.1(3), RSMo Cum.Supp.2006. "Some acts of deviate sexual intercourse might not involve penetration and still be within the statutory definition. By defining sexual intercourse as a 'sexual act' involving the genitals of one person and the 'hand' of another, a wide variety of sexual activity could be classified as deviate sexual intercourse." *State v. Gibson*, 623 S.W.2d 93, 99 (Mo.App. W.D.1981) (where defendant was convicted of sodomy after nine-year-old female victim related at trial an act of fellatio and an act of anal intercourse by the defendant); *see also, State v. Scott*, 348 S.W.3d 788, 790 (Mo.App. S.D.2011) (where defendant was charged with three counts of forcible sodomy for forcing minor female victims to put their mouths on his penis) and *State v. Edwards*, 365 S.W.3d 240, 243 (Mo. App. W.D.2012) (where defendant was convicted of sodomy and minor female victim claimed both anal and oral sexual contact by defendant had occurred).

12. Ms. Chism noted that the April 21st report was not passed to her until April 26th.

that Mother had filled out, she and Ms. Escudero "started to have a lot more concerns regarding the children and regarding the things that [Mother] was doing[.]" Forty-eight hours after actively investigating the reports, Ms. Chism participated in [13] the "determination [by Children's Services] to send a referral to the Juvenile Office" on April 27, 2011.[14]

Ms. Chism testified that Children's Services concerns were:

[T]hat when [Mother] checked the children into Isabel's House, she made allegations, again, of sexual abuse. These are all documented with things that, I think, Ms. Lowe has. She made allegations of the sexual abuse, although now alleged that the twins were involved as well. She was bringing up the burn again and alleging issues at dad's house because of the burn. She had moved them from a domestic violence shelter to Isabel's House even after she had been advised that there were no concerns with [Father]. We had a lot of concerns that she just didn't seem to hear us when we said the reports were unsubstantiated,[15] and then we had concerns that they had been interviewed multiple times at CAC, multiple times by police, multiple times by Children's Division workers. She'd pulled them out of school to take them to these domestic violence shelters based on things that we could find no evidence of being fact.

Ms. Chism further testified that she came to the finding that Mother was "exploit[ive], nonsexual" because:

It was the totality of everything. Was the number of times the children have been interviewed, the number of CAC's, the doctor visits she would take them on after visits with their dad, the continual allegations towards him even after she's been told they were unsubstantiated or there's nothing to support that. She pulled them out of school and daycare to take them to a domestic violence shelter based on, I think, very little evidence that there was any danger to the children, disrupted their lives by doing that. The taking the pictures of the children's genital areas and sending them to various people.[16] The totality of all of that. I felt like she was doing this in her attempt to prove that he was doing something wrong in the face of no evidence of that.

At the juvenile conference, Ms. Chism discussed Children's Services' concern with Father. Ms. Chism testified that Father "understood the concerns and shared a lot of them," "indicated it was not really a new thing," and "was not really surprised that there were allegations of sexual abuse, because it was always something."

13. Ms. Chism testified that she had the case "[a]bout a day" before making the referral and that the referral was not her decision alone, but that her supervisor had been involved from the day the report was received on April 20th and that she "was also aware and requested that we make the referral."

14. Also on this date, Ms. Chism requested the children's medical records for the past two years from their pediatrician; however, she did not think it was important to actually see the records prior to making the referral because she "knew that the GAL had all and had seen all the medical records."

15. During cross-examination, Ms. Chism was asked, "If a report is found as unsubstantiated, does that mean that abuse did not occur?", to which she replied, "Not necessarily." Likewise on cross-examination, the GAL was asked, "Just because you have not seen evidence of the sexual abuse, does that mean that it did not happen?," to which he replied, "Oh, certainly not."

16. This statement references the Children's Services workers and GAL. There is no indication pictures of the children's genitalia were ever disseminated to the public.

By our calculations, Mother may have made a report on February 4, 2010, regarding Father not taking his medication and having guns. Father admitted to both, but stated he decided to lock up his guns. Mother may have made a call regarding a bruise on B.T.C. There was a bruise. Mother also may have made an additional call regarding the chemical burns on a three-year-old's genitalia. Again, this would be acceptable if not mandated. The final hotline Mother may have made was about the same incident that the mandated reporter, the child's counselor for a year, made. Substantial evidence does not support a claim that Mother's actions were emotional abuse; she was showing concern when a child was injured.

The issue is not whether Children's Services concluded that the allegations were "unsubstantiated," to use their terminology, or innocent contact. Actual bruises, chemical burns, and a spouse carrying guns and getting off necessary medication all are based in reality. In this case, there was evidence to support every allegation. There may have been explanations for the injuries to the children, but chemical burns due to lack of supervision and a complaint by a child of possible sexual abuse warrant an investigation. It is disingenuous of Children's Services to claim these statements do not provide evidence of abuse when nearly identical statements made by children have supported criminal charges. See State v. Ridenour, 334 S.W.3d 724, 725–27 (Mo.App. S.D.2011) (where child victim disclosed abuse by her father, victim and her brother were removed from the home and placed in foster care, and defendant father was subsequently charged with and convicted of the class C felony of the use of a child in a sexual performance based on child victim's testimony of abuse); State v. Doolen, 759 S.W.2d 383, 384 (Mo.App. S.D.1988) (where defendant was charged with and jury-convicted of first-degree sexual abuse when the only evidence of sexual contact by defendant with the child came from the boy's testimony); and State v. Pollard, 719 S.W.2d 38, 42 (Mo.App. E.D.1986) (holding that the child victim's testimony was not unduly influenced by the presence of his mother just inside the railing and, therefore, there was no prejudicial harm to defendant, and noting the testimony of child victims is "often of critical importance since they are often the only occurrence witness"). In fact, a mandated reporter, the children's therapist, felt she was obligated to call the hotline and report potential abuse on just those statements.

The court erred in determining that Mother abused the children by not concurring in the Children's Services determination that there was no sexual or physical abuse by Father. It is not abuse or neglect for Mother to make a hotline when she had "reasonable cause to suspect that a child has been or may be subjected to abuse or neglect[.]" Section 210.115.4. In fact, a parent's failure to acknowledge that the other parent could be abusing children could be grounds for terminating parental rights. See In re P.L.O., 131 S.W.3d 782, 790 (Mo. banc 2004) (where mother's parental rights were terminated when she failed to protect child even though she saw father touch child in an "unfatherly" way and failed to seek immediate medical care for child); In re K.L.C., 332 S.W.3d 330, 336 (Mo.App. S.D.2011) (where father's parental rights were terminated although he did not suffer from a mental condition because he did not recognize that mother did suffer from unbeatable mental conditions); C.V.E. v. Greene County Juvenile Office, 330 S.W.3d 560, 564–67 (Mo.App. S.D.2010) (where children's allegations of abuse by father were substantiated and mother's parental rights were terminated, in part, for her "inability/unwillingness" to

protect the children); *In re N.J.B.*, 327 S.W.3d at 535, 540 (where the juvenile division took jurisdiction of mother's child when mother did not believe child about sexual abuse thereby placing her at risk of further abuse); *In re M.N.J.*, 291 S.W.3d 306, 308 (Mo.App. W.D.2009) (where jurisdiction was taken over mother's children when mother failed to protect the children from spanking with a belt); *In re N.J.S.*, 276 S.W.3d 397, 401 (Mo.App. E.D.2009) (where mother's parental rights were terminated when mother knew or should have known abuse was committed because she knew of her boyfriend's "abusive nature"); *In re K.T.K.*, 229 S.W.3d 196, 202 (Mo. App. S.D.2007) (where father's parental rights were terminated for neglect when child was brought to father's house with a gash on her forehead and father failed to seek medical treatment); *In re B.N.W.*, 115 S.W.3d 869, 873 (Mo.App. S.D.2003) (where mother's parental rights were terminated when even though she claimed she was also a victim of abusive man she failed to protect the child); *In re A.M.C.*, 983 S.W.2d 635, 638–39 (Mo.App. S.D.1999) (where Mother's parental rights were terminated, a children's services worker testified that Mother was not very active in protecting her children, and the children denied being sexually abused); *In re C.S.*, 910 S.W.2d 811, 813 (Mo.App. E.D.1995) (where mother's parental rights were terminated when mother knew or should have known about abuse where father tied child with a bandanna to the bed and did not seek medical care for bruises); and *In re D.O.*, 806 S.W.2d 162 (Mo.App. W.D.1991) (where mother's parental rights were terminated when child reported sexual abuse and mother maintained her relationship with the man who was the alleged abuser).

## A. [2] TWO CAC INTERVIEWS HAVE BEEN DONE OF ALL OF THE CHILDREN AND NO DISCLOSURES HAVE BEEN MADE. MULTIPLE INTERVIEWS HAVE BEEN DONE OF THE CHILDREN BY CHILDREN'S DIVISION WORKERS AND LAW ENFORCEMENT AND THERE HAS BEEN NO EVIDENCE TO PROVE THE ALLEGATIONS.

The Petitions claim there was no evidence to support the allegations. That claim is rebutted by the children's words to various counselors. The CAC forensic interviewer who conducted the interviews with the children as a result of the hotline made by the mandated reporter and counselor of the children testified that A.B.C. made a verbal disclosure that "daddy tried to touch her butt" and that E.L.C. stated "her dad touched her front and back bottom with a glove on his hand." E.L.C. further "stated she told her dad her bottom was hurting and they were in the bathroom" and "she had seen her father touch her brother's penis." She also stated that her "dad was mean and he hit her in the leg" and "threw a drawer at her brother." B.T.C. stated "his dad is mean." [17]

To the extent the Petitions claim there were too many interviews, it appears that at least one hotline was made by a different mandated reporter and involved B.T.C.'s behavior in Head Start. Therefore, we have no idea whether Mother caused the other interview to be done by making a hotline call but we do know there was no evidence presented regarding that hotline or interview.[18] Furthermore,

---

17. We do not include these facts for the truth of the allegations, but because the allegations were the basis for Mother's reasonable cause to suspect abuse.

18. Ms. Tynes testified that neither B.T.C. nor E.L.C. have ever disclosed any abuse by either of their parents during their counseling sessions.

Mother has absolutely no control over how many interviews are conducted by the CAC or police. If it is abusive to have children interviewed multiple times by the CAC and the police after a hotline, then only Children's Services can remedy that abuse. Multiple interviews by the CAC was not a valid claim of abuse against Mother.

## A. [3] [B.T.C.] REPORTED THAT HIS MOTHER TAKES PICTURES OF HIS PENIS AND [E.L.C.] DISCLOSED THE MOTHER TOLD HER WHAT TO SAY FOR THE INTERVIEWS.

Apparently, Mother took pictures of the burns on the three year old. She presented those pictures to the Children's Services workers and the GAL in the dissolution case. Both Ms. Escudero and Ms. Chism testified that they expressed to Mother that taking pictures of the children's genitalia was inappropriate. Ms. Chism further testified that Mother told her that someone at the domestic violence shelter told her it was a good idea to take the pictures. Mother told the worker that she was advised by both her counselor and the children's doctor to take pictures of the children's genitalia if she had concerns of abuse.

■ Ms. Escudero refused Mother's request to view photographs of a rash on one of the twins and admonished Mother that it was not appropriate to take pictures of the children's genitalia. The GAL also received the pictures and remarked that based on his quick view of the pictures, "It seemed like there was some type of a rash on the-in the vaginal area." The trial court refused to admit the pictures into evidence and that ruling has not been appealed. There was no evidence at trial that Mother did anything other than to try to document, by photographs, her children's injuries. It is hard to imagine how

else injuries could be shown when they are later denied. She showed the GAL and Children's Services. Surely, both of them were appropriate recipients. Substantial evidence does not support that Mother was abusive in taking the pictures of the children's injuries.

## B. THE MOTHER REMOVED THE MINOR CHILDREN FROM SCHOOL AND DAYCARE AND MOVED THEM TO A SHELTER IN POLK COUNTY DUE TO HER CONCERNS OF THE FATHER'S REACTION TO THE ALLEGATIONS. SHE THEN MOVED THE CHILDREN TO ISABEL'S HOUSE. THE CHILDREN HAVE BEEN TOLD NOT TO TELL THEIR FATHER WHERE THEY ARE LIVING AND THAT THEY ARE STAYING IN A "SAFE HOUSE". THE CHILDREN HAVE BEEN REPEATEDLY REMOVED FROM SCHOOL AND DAYCARE TO BE TAKEN TO DOCTOR'S APPOINTMENTS AND INTERVIEWS.

■ The children have been to counseling throughout the dissolution case, often at the request of Head Start or the GAL. Initially, we note there is absolutely no requirement that children attend Head Start or any other preschool program. Although the Head Start workers may have been concerned about B.T.C.'s attendance at preschool, there was no evidence presented at the trial that indicated what B.T.C.'s attendance was at school and that B.T.C. had missed an inordinate amount of "school" due to doctor's appointments and interviews. Nor was there evidence of how many appointments and interviews took place that were not the result of Children's Services requesting the interviews. The evidence indicates Mother took a child to the hospital after the chemi-

cal burn and regularly took the children to counseling. None of the remaining allegations contain even an allegation of abuse.

## C. THE PARENTS HAVE BEEN GOING THROUGH A DIVORCE SINCE 2009, SINCE THEY SEPARATED THERE HAVE BEEN [NINE] REPORTS TO CHILDREN'S DIVISION WITH ALLEGATIONS OF ABUSE BY THE FATHER. PRIOR TO SEPARATION THERE WERE NOT ANY REPORTS.

It is not an allegation of abuse to state that the parents have been going through a divorce since 2009. The remainder of the allegation is a rehash of allegation "A." Paragraph C does not contain a legal allegation that Mother has abused the children.

## D. THE FATHER HAS TAKEN NO ACTION TO REMOVE THE CHILDREN FROM THEIR MOTHER'S CARE. THE FATHER IS EITHER UNWILLING OR UNABLE TO PROTECT THE CHILDREN.

Father has not appealed this judgment; however, there is no allegation of abuse if Mother has not abused the children. What happened here is that the juvenile court became involved in what was essentially a dissolution matter. Katherine Tynes, a licensed clinical social worker, was called by Children's Services; she claimed Mother's relationship with B.T.C. was "too enmeshed." When she was asked by the court of the difference between "hyper-vigilant" and "too enmeshed," she claimed, "hyper-vigilant is overprotective at times, extremely sensitive to issues. Enmeshed means that there's not a real healthy bond, it's not an appropriate bond." Ms. Hassani, the children's counselor, stated that mother was hyper-vigilant, which she described as "something that someone who, as a child has suffered abuse, would be classically doing when they are parenting their children in order to provide a safe environment for that child."

The GAL concurred in the opinion that Mother was "hyper vigilant," specifically describing Mother's home as follows: "[T]he gates everywhere, the locks on everything. And I certainly observed the kids being very precise about where things went and being—it was a little-off-putting to see kids being just a little bit too regimented. But other than that, I mean, she certainly seemed appropriate with the kids." The GAL was sent the pictures and did notice a rash in the vaginal area, but "[i]t seemed like a—I've got three girls, so it seemed like kind of the rash that, you know, you would see on—you would occasionally see." He felt there was a disconnect between Mother's perception of what was going on and what "everybody else can see" about Father. He stated when the divorce began, Father said Mother was the "best mom in the world, and not a better mom than [Mother]"; she was just great. Being "off-put" by excessive safety concerns does not rise to the level of a parent being abusive or neglectful of children.

On the other hand, Father did admit to the GAL that he had spanked B.T.C. an excessive amount of times prior to their separation but he felt remorse over it. The GAL was concerned that Father did not fight back during the dissolution; he ultimately recommended supervised visits between Mother and the children and had no concerns with the children being with Father. Perhaps those are the considerations that a court-appointed GAL can bring to the attention of a judge in a dissolution; however, what is before us is State action to take the custody of children

away from parents. There was no evidence that Mother did not really fear for the children's safety. Mother may be "over-protective," but she may have had a legitimate reason to be concerned.

Before the juvenile court takes away the fundamental right of a parent to raise their child, within a wide range of acceptable parenting styles of being "very precise" and somewhat lackadaisical, the trial court must find by clear and convincing evidence that the child is without proper care, custody, or support. We review the evidence to determine whether substantial evidence supports that determination. The evidence in this case falls far short and, in some instances, there are not proper allegations of a failure to provide care for the children. No Missouri case has ever held that placing calls to the "hotline" constitutes abuse and there is no substantial evidence to support the claim that it was abuse in this case. *See In re K.A.W.*, 133 S.W.3d 1, 13 (Mo. banc 2004) (noting that no reported Missouri case has ever held that placing a child up for adoption more than once rises to the level of abuse and holding that mother's two attempts to place her twins for adoption were not abuse and were not an indication of potential future harm to her twins). The trial court erred in concluding that Mother emotionally abused the children or that she presents a likelihood of future harm. Therefore, the court erred in taking jurisdiction of the minor children.

The judgment is reversed.

GARY W. LYNCH, P.J. and WILLIAM W. FRANCIS, JR., J., Concur.